## STATE v. THOMAS PATTERSON.

*Dying Declarations.    Burden of Proof.    Right of Court to
Communicate with Jury out of open Court, and while consid-
ering of their Verdict.    The sense in which a man's House is
his Castle.*

It is not necessary in order to make dying declarations admissible in evidence, that the
declarant should state everything constituting the *res gestæ* of the subject of his state
ment; but only that his statement of any given fact should be a full expression of all
that he intended to say as concerning his meaning as to such fact.

The fact that a witness, by whom dying declarations are sought to be proved, reduced the
declarations to writing at the time they were made, but has lost the memorandum, does
not bear upon the question of their admissibility, but only upon the reliability of the
recollection of the witness.

On trial of an indictment for manslaughter, the court charged the jury that, "if they
were convinced beyond a reasonable doubt that the death of the decedent was occa-
sioned by the shot fired by the respondent, then the prosecution had made out the kill-
ing in the manner charged in the indictment * * *. That all killing is presumed to
be unlawful; and when the fact of the killing is established, it devolves on the party
who committed the act to excuse that killing—to show that it was justified—in order to es-
cape the legal consequences which attach to the commission of the act." *Held*, error;
and that exculpatory evidence having been given on trial, the jury should have been
instructed, in substance, that, upon all the evidence, they must find beyond a reasonable
doubt that the crime charged in the indictment was committed by the respondent, in
order to warrant his being found guilty.

It is error for the court to have any communication with the jury after a case has been
submitted to them, and while they have it under consideration, except in open court.

It is also error for the court to furnish the jury a copy of the statutes of the state while
they are out of court deliberating upon their verdict, that they may read certain pro-
visions, designated by the court, touching the case under consideration.

The case of *State v. Hooker*, 17 Vt. 670, commented upon and explained.

The idea embraced in the expression, that *a man's house is his castle*, is, not that it is his
property, and that, as such, he has the right to defend and protect it by other and more
extreme means than he might lawfully use to defend and protect his shop, his office, or
his barn. The sense in which the house has a peculiar immunity, is, that it is sacred
for the protection of his person, and of his family. An assault on the house can be re-
garded as an assault on the person, only in case the purpose of such assault be injury
to the person of the occupant, or members of his family, and in order to accomplish
this, the assailant attacks the castle, in order to reach the inmate. In this view, it is
said and settled that, in such case, the inmate need not flee from his house in order to
escape injury by the assailant, but he may meet him at the threshold, and prevent him
from breaking in, by any means rendered necessary by the exigency—and upon the same
ground and reason that one may defend himself from peril of life, or great bodily
harm, by means fatal to the assailant, if rendered necessary by the exigency of the as-
sault.

Where the defense can legitimately claim that there was an assault on the respondent's
house, with the intent, either of taking his life, or of doing to him great bodily harm,
the respondent would be justified in using a deadly weapon, if it should be necessary
in order to prevent the perpetration of such crime, or if, under the circumstances at-

tending the emergency, the respondent had reason to believe, and was warranted in believing, and in fact did believe, th.t it was necessary in order to prevent the commission of such crime.

In case the purpose of an assailant is to take life, or inflict great bodily harm, and the object of his attack upon a house is to get access to the occupant for such purpose, the same means may lawfully be used to prevent him from breaking in, as might be used to prevent him from making the harmful assault upon the person, in case the parties were met face to face in any other place. In either case, the point of justification is, that such use of fatal means was necessary in order to the rightful, effectual protection of the respondent, or his family, from the threatened or impending peril.

INDICTMENT for manslaughter. Plea, the general issue, and trial by jury, April term, 1872, ROYCE, J., presiding.

On trial, the evidence tended to show that on the 24th of May, 1871, the respondent was living with his wife, mother and sisters, in a tenement house in the village of St. Albans; that on the evening of that day, George W. Flanders, the decedent, and one Watson, being under the influence of liquor, went to the respondent's house, after he and his family had retired for the night, and, knocking at the door, asked to be let in; that the respondent raised the window of his room and told them that he did not want any one there, and that they could not come in; that they said they wanted to come in and talk with the respondent, and kept insisting upon being let in, and remained some time, insisting, and grew more violent the longer they stayed, and repeatedly threatened to break the door down, and swore, and used abusive language, and threw a brick or stone through the window; that one of them took off his hat and commenced taking off his coat, and started towards the door, whereupon the respondent went into another room and got a gun that he had used some days before, hunting, and which was loaded with shot, and put the barrel on the window sill and fired, giving the said Flanders a mortal wound, of which he died. The respondent testified that he fired to the ground, and that his object was, not to hit them, but to scare them away.

The prosecution introduced Morrill J. Hill as a witness to prove the dying declarations of the decedent, who testified that he saw him after he was shot; that in answer to his inquiries he made statements concerning the occurrence connected with the shooting; that he was so weak that the witness could not get a

full or detailed statement of the affair from him, and got only detached statements in the intervals between the spells of vomiting; that he took the words of the decedent on paper at the time, to preserve his dying declarations, but that the paper was lost; that the statements were made by the decedent in the consciousness that he was in a dying condition. To the admission of this testimony the respondent objected, but the same was admitted; to which the respondent excepted.

The respondent requested the court to charge that "the making of an attack upon a dwelling, and especially at night, the law regards as equivalent to an assault upon a man's person; for a man's house is his castle." But the court refused so to charge; to which the respondent excepted. The court charged the jury that, "if they were convinced beyond a reasonable doubt that the death of Flanders was occasioned by the shot fired by the respondent, then the prosecution had made out the killing in the manner charged in the indictment * * *. That all killing of a human being is presumed to be unlawful; and when the fact of the killing is established, it devolves on the party who committed the act to excuse that killing—to show that it was justifiable—in order to escape the legal consequences which attach to the commission of the act"; to which the respondent excepted.

After the jury had retired to consider of their verdict, they sent the following inquiry in writing to the court, by the officer having them in charge: "What is the law in relation to manslaughter in the third degree, or what is the punishment for manslaughter in the third degree?" and the presiding judge, while the court was in session and the jury in their room for deliberation, without the knowledge of the respondent or his counsel, or the counsel for the state, sent to the jury in their room, and without their coming into open court, the following communication in writing: "There are no degrees in manslaughter under our laws; but the amount and kinds of punishment that shall be inflicted you will see are, with certain limitations, in the discretion of the court"; and the court sent the General Statutes to the jury in their room, and referred them to § 15, ch. 112. To which, after the verdict of guilty had been returned,

and as soon as the fact came to their knowledge, the counsel for the respondent excepted.

*Farrington & McIntyre* and *Benton & Irish*, for the respondent.

Mr. Hill's testimony to the dying declarations of Flanders was improperly admitted. From his testimony it appears that he could not get a complete statement from Flanders, but only fragments. This is not sufficient 1 Greenl. Ev. § 159.

The charge of the court as to the burden of proof, was erroneous. "The burden of proof never shifts, but is upon the government throughout." Redfield's note, 1 Greenl. Ev. § 81 b ; *Commonwealth* v. *McKie*, 1 Gray, 61. "It is the duty of the court, first, to pronounce the criminal innocent until he is proved guilty, and secondly, after he is shown to have committed a homicide, to look for every excuse which may reduce the guilt to the lowest point consistent with the facts proved." *State* v. *McDonnell*, 32 Vt. 491, 538. Whether this rule is sufficiently comprehensive to embrace cases of what may be termed extraneous justification, as the question of sanity, it is not necessary to inquire here ; but to the extent this case goes, namely, the circumstances attending the act and constituting the *res gestæ*, it is not now controverted. 1 Whart. Crim. Law, § 708, note ; 3 Greenl. Ev. § 149, note; *Commonwealth* v. *Hawkins*, 3 Gray, 465.

The court refused to give any practical effect to the doctrine that a man's house is his castle. The respondent was entitled to a charge in that respect in accordance with his request. 2 Bishop Crim. Law ( 3d ed. ), § 653, and note ; *Pond* v. *People*, 8 Mich. 150, 177 ; *Commonwealth* v. *Drew*, 4 Mass. 396 ; 2 Whart Crim. Law, §1024 ; *State* v. *Hooker*, 17 Vt. 658, 670 ; Whart. Homi. 233.

The court erred in holding any communication with the jury in their room while they were considering upon their verdict. If at all, the jury should have been called into open court, and the communication there made, in the presence of the counsel and respondent. Hilliard New Trials, ch. 10, §§ 35, 36, 37, and note A ; Ib. ch. 11, §§ 156, 157 ; 3 Whart. Crim. Law, § 3136–39 ; *Sargeant* v. *Roberts*, 1 Pick. 339 ; *Merrill* v. *Nary*, 10 Allen, 416 ; *Burrows* v. *Unwin*, 3 C. & P. 310 ; *Taylor* v. *Betsford*,

State v. Patterson.

13 Johns. 487 ; *Hoberg* v. *State*, 3 Minn. 262. It was also error for the court to allow a copy of the statutes to be taken to the jury in their room. *Merrill* v. *Nary, supra ; Newkirk* v. *State*, 27 Ind. 1 ; *Burrows* v. *Unwin, supra.* In all cases, parties have a right to a trial in accordance with the established rules of practice of courts, and, *a fortiori*, in cases where the life or liberty of the party is at stake, is he entitled to such a trial that the verdict shall be above suspicion. It should be beyond all doubt. *State* v. *Prescott*, 7 N. H. 287 ; *People* v. *Douglass*, 4 Cow. 26. Even in civil cases this rule is adhered to strictly. *Brant* v. *Fowler*, 7 Cow. 562 ; *Taylor* v. *Betsford, supra.* A new trial will be granted when the communication is directly calculated to influence the minds of jurors, although, in point of fact, the verdict was not influenced. *McDaniels* v. *McDaniels*, 40 Vt. 363, 374 ; *Brant* v. *Fowler, supra ; Taylor* v. *Betsford, supra ; Madden* v. *State*, 1 Kan. 340. In the case at bar, it is fair to presume that the jury would not have made the inquiry they did, if, at the time, they had agreed upon a verdict. The fact of making the inquiry raises the presumption that the communication influenced their verdict, and it devolves upon the state to show that it did not. *McDaniels* v. *McDaniels, supra ;* Hilliard New Trials, ch. 3, § 18 ; Ib. ch 7, §§ 1, 2 ; Ib. ch. 10, § 51.

*George A. Ballard* and *W. D. Wilson,* for the state.

The testimony of Hill was properly admitted, the court having first become satisfied that the declarations were made by the decedent in the belief and consciousness that he was at the time in a dying condition. Roscoe Crim. Ev. 22–3–4 ; U. S. Crim. Dig. 151–174 ; *State* v. *Howard*, 32 Vt. 380, 404 ; *State* v. *Center et al.* 35 Vt. 378.

The charge of the court was correct, and presented the defense in every legal light that the testimony had any tendency to put it. The request to charge is subject to the objection that it does not contain sound law to the full extent. *Vaughan* v. *Porter*, 16 Vt. 266 ; Roscoe Crim. Ev. 464, 581–2, 638–9, 643 ; 2 Bishop Crim. Law, §§ 627, 630, 632, 641, 643, 727, 729,

The grounds relied on for a new trial are insufficient to justify this court, in the exercise of a sound discretion, in setting aside the verdict. The same rule obtains in criminal, as in civil cases. Hilliard New Trials, 113–14. It is not only incumbent on the petitioner to show some irregularity in the proceedings of the court, or misconduct of the jury, but, also, that such irregularity and misconduct tended to influence the verdict, and prejudice his rights. The acts complained of could not, by any reasonable intendment, have had any influence upon the jury in determining the guilt or innocence of the respondent. *State* v. *Camp*, 23 Vt. 551 ; *Peacham.* v. *Carter*, 21 Vt. 515 ; *Downer* v. *Baxter*, 30 Vt. 467 ; *Denison et als.* v. *Powers*, 35 Vt. 39 ; *McDaniels* v. *McDaniels*, 40 Vt. 363 ; *Vaughan* v. *Porter, supra ; State* v. *Bryant*, 21 Vt. 479 ; 12 Pick. 518 ; Hilliard New Trials, 224.

The opinion of the court was delivered by

BARRETT, J. It is objected in behalf of the respondent that the dying declarations of Flanders, as testified by Mr. Hill, should have been excluded from the consideration of the jury, by force of the rule as stated 1 Greenl. Ev. § 159, viz., that " whatever the statement may be, it must be complete in itself; for, if the declarations appear to have been intended by the dying man to be connected with, and qualified by, other statements which he is prevented by any cause from making, they will not be received." What we understand by the expression, that the statement " must be complete in itself," is, not that the declarant must state every thing that constituted the *res gestæ* of the subject of his statement, but that his statement of any given fact should be a full expression of all that he intended to say as conveying his meaning as to such fact. This is plainly indicated by the closing part of the above quotation, as to the declarations made being intended by the dying man to be connected with, and *qualified* by, other statements which he is prevented from making. There is no indication in the testimony given by Mr. Hill, that Flanders intended what he said to Hill should be qualified by any thing that he wished to say, and was prevented from saying, or did not. say. The fact that Mr. Hill had lost the paper containing the declarations in

writing, does not bear on the question. It may have some bearing as to the weight which ought to be accorded to the evidence thus given, as depending on the accuracy of his recollection and his correctness in repeating from memory what Flanders said to him. But this, in that respect, is only the common case of comparative reliableness, as between the statement of facts orally from memory, and the statement of them in written memoranda made at the time the facts occurred.

The fact that Flanders made his statement in intervals between vomitings, does not touch the question of the competency of the evidence, unless it should appear that by such vomitings, he was prevented from expressing his meaning in relation to the facts that he was undertaking to state. By recurring to the testimony of Mr. Hill, given in full in the reporter's minutes, it will be seen that the facts are few and simple, about which the dying man undertook to speak ; and there is nothing in their nature that would seem to require any thing more to have been said in order to get the meaning that he intended to convey in respect to them. The manner and circumstances of the making of the dying declarations are proper for consideration, in giving effect to them as evidence in the case, much the same as if the deposition of the dying man had been taken, and given in evidence on the trial.

II. The court charged the jury that if they were convinced beyond a reasonable doubt that the death of Flanders was occasioned by the shot fired by the respondent, then the prosecution had made out the killing in the manner charged in the indictment * * * that all killing is presumed to be unlawful ; and when the fact of the killing is established, it devolves on the party who committed the act, to excuse that killing—to show that it was justified—in order to escape the legal consequences which attach to the commission of the act." In this we think there is error. As to the rule of presumption, as affecting the burden of proof, as it is ordinarily found in the books on criminal law, especially the older ones, it suffices to refer to the remarks of Ch. J. Redfield, in *State* v. *McDonnell*, 32 Vt. 538–9. Yet, with reference to that rule, as it was applied to the present case, the statement of it in Foster, 255, is worthy of notice. " In every charge of

murder, the fact of killing being first proved, all the circumstances of accident, necessity, or infirmity are to be satisfactorily proved by the prisoner, *unless they arise out of the evidence adduced against him*, for the law presumeth the fact to have been founded in malice, until the contrary appeareth." In Roscoe Crim. Ev. 20, that quotation is preceded by this statement, viz. : " When a man commits an unlawful act, *unaccompanied by any circumstances justifying its commission*, it is a presumption of law that he acted advisedly, and with an intent to produce the consequences which have ensued."

In *York's* case, 9 Met. 91, the meaning of the rule is peculiarly indicated by the manner in which Ch. J. SHAW stated it : " That where the killing is proved to have been committed by the defendant, and *nothing further is shown*, the presumption of law is that it was malicious, and an act of murder." That meaning is made palpable and is illustrated by the same great judge in *Hawkins's* case, 3 Gray, 465, in which he says, " that this was inapplicable to this (*Hawkins's*) case, where the circumstances attending the homicide were fully shown by the evidence." And on this point he instructed the jury that " the murder charged must be proved ; the burden of proof is on the commonwealth to prove the case ; all the evidence on both sides, which the jury find true, is to be taken into consideration ; and if, the homicide being conceded, no excuse or justification is shown, it is either murder or manslaughter ; and if the jury, upon all the circumstances, are satisfied beyond a reasonable doubt that it was done with malice, they will return a verdict of murder ; otherwise, they will find the defendant guilty of manslaughter."

In *McKie's* case, 1 Gray 61, on an indictment for assault and battery with a dangerous weapon, the subject of the burden of proof in that class of offenses was fully considered by the court, and instructively discussed by BIGELOW, J., in the opinion of the court drawn up by him. He says : " It appears that the justification on which the defendant relied was disclosed, partly by the testimony introduced by the government, and in part by evidence offered by the defendant ; and that it related to and grew out of the transaction or *res gestæ* which constituted the alleged crim-

inal act." The result is stated thus : " But in cases like the present, * * * where the defendant sets up no separate in- dependent fact in answer to the criminal charge, but confines his defense to the original transaction charged as criminal, with its accompanying circumstances, the burden of proof does not change, but remains upon the government to satisfy the jury that the act was unjustifiable and unlawful." Preceding this extract, it is said, " Even in the case of homicide, where a stricter rule has been held as to the burden of proof than in other criminal cases, upon peculiar reasons applicable to that offense alone, it is conceded that the burden is not shifted by proof of a voluntary killing, where there is excuse or justification apparent on the proof offered in support of the prosecution, or arising out of the cir- cumstances attending the homicide "; citing *York's* case, *supra*, and *Webster's* case, 5 Cush. 305.

We adopt the views thus shown, in their application to the present case, so far as to hold that, with reference to the state of the evidence given on the trial, the jury should not have been instructed as they were in the parts of the charge above recited, but should have been instructed, in substance, that upon all the evidence, they must find beyond a reasonable doubt that the crime charged in the indictment was committed by the respondent, in or- der to warrant his being found guilty,—with proper adaptations of the instruction to this feature of the case, as presented in the course and manner of the trial.

III. The exception to the communication of the presiding judge with the jury, and sending to them a copy of the statutes, with a reference to a particular section, is maintained. The pre- vailing idea in this state has been that all communications be- tween judge and jury, after a case has been submitted to the jury and while they have it in consideration, should be in open court, and, so far as we know, the practice has been conformable to this idea.

In 1 Pick. 242, *Sargent* v. *Roberts et al.*, Ch. J. PARKER says : " We are all of opinion, after considering the question maturely, that no communication whatever ought to take place between the judge and jury after the cause has been committed to them by

the charge of the judge, unless in open court, and, when practicable, in presence of the counsel in the cause." See *Taylor* v. *Betsford*, 13 Johns. 487.

As to furnishing the jury with a copy of the statutes, we regard the rule to be equally distinct and decisive, not only in this state, but elsewhere. 3 C. & P. 310, *Burrows* v. *Unwin*. In *Merrill* v. *Nary*, 10 Allen, 416, a copy of the statutes was carried to the jury at their request, and with the consent of the judge. This was held to be improper ; and the proper views applicable to the subject are so amply set forth in the opinion delivered by Ch. J. BIGELOW, as to render it needless to do more than refer to that opinion.

In other respects, we deem the charge to be conformable to the established principles of the law as promulgated in the text-books and treatises, and applied and illustrated in the decided cases. From what is made known to us by the bill of exceptions as to the evidence given and the facts proved in the trial, we fail to discover in the charge ground or occasion for such a character and spirit of criticism as was exhibited in the argument before this court. On the other hand, I am commissioned to express the full conviction of each member of this court, that the utmost fairness towards the respondent, and great painstaking that he should suffer no abatement from the legitimate force of his defense, were exercised by the presiding judge.

From experience at the bar and on the bench, we very fully understand that many things in the features and details of a charge to the jury are prompted by, and are addressed to, peculiar features and details of the argument that has preceded. From the requests and points of exception stated in the record before us, together with the arguments which we have here heard, the present case seems not to be exceptional in that respect. If we had before us the arguments addressed to the jury, with the same verbal fullness that we have the charge of the court, it seems quite presumable that we should find reason to admire, if not to be surprised at, the self-poise with which the presiding judge bore himself in the charge, as against operating prejudice to the respondent.

It is not deemed needful for the purposes of this case, with reference to its future prosecution, to discuss specifically any other subject, except that of the dwelling-house being one's castle, as bearing upon his right to kill or to use deadly weapons in defense of it. This is presented in the 3d request in behalf of the respondent, which is, in the language used by HOLROYD, J., in charging the jury in *Meade's* case, *infra,* viz. : "The making of an attack upon a dwelling, and especially in the night, the law regards as equivalent to an assault on a man's person, for a man's house is his castle." The purpose of this request seems to have been, to justify the killing with the gun, as a lawful mode and means of defending the *castle,* as well as the person within it. Looking to the state of the evidence, it is not altogether obvious what there was in the case to warrant its being claimed that the respondent killed Flanders as a means of defending himself or his castle. It was claimed in behalf of the prosecution, and the evidence given in that behalf showed, that the gun was not fired at Flanders as a measure of force, to repel and prevent him from breaking into the house. Moreover, in the exceptions it is said, "The respondent testified that he fired to the ground, and the object in firing was, not to hit them, but to scare them away." The respondent seems not to have regarded it a case, or a conjuncture, in which it was needful or expedient to use a deadly weapon as a means of forceful resistance to meet and repel an assault on his house—whatever such assault in fact was—or to protect himself from any threatened or feared assault on his person. The gun, loaded with powder alone, would have served all the needs of the occasion, and of the exigency which the respondent supposed then to exist and to press upon him.

Nevertheless, the point was made by said 3d request. It was indicated in the charge that the case, *State* v. *Hooker,* 17 Vt. 670, was invoked in support of it, and it i cited in this court for the same purpose. That case professes to decide only the question involved in and presented by it, viz., whether it was criminal under the statute for the respondent to resist an officer in the service of civil process within his dwelling-house, such officer having unlawfully broken into the house for the purpose of making such

service. The language of the opinion is to be interpreted with reference to the case and the question. That case in no respect involved the subject of the use of a deadly weapon with fatal effect in defense of the castle; and it is not to be supposed that the judge who drew up the opinion was undertaking to discuss or propound the law of that subject.

To come, then, to the subject as it is involved in this case under said 3d request. In Foster's Crown Law, 319, it is said, " The books say that a man's house is his castle for safety and repose to himself and family." In *Cook's* case, Cro. Car. 537, an officer, with a *capias ad satisfaciendum*, went with other officers, for the purpose of executing the same, to the dwelling-house of the respondent, and, finding him within, demanded of him to open the door and suffer them to enter. He commanded them to depart, telling them they should not enter. Thereupon, they broke a window, and afterwards went to the door of the house and offered to force it open, and broke one of the hinges; whereupon Cook discharged his musket at the deceased and hit him, and he died of the wound. " After argument at the bar, all the justices, *seriatim*, delivered their opinions, that it was not murder, but manslaughter; the bailiff was slain in doing an unlawful act in seeking to break open the house to execute process for a subject, and every one is to defend his own house. Yet they all held it was manslaughter; for he might have resisted him without killing him; and when he saw and shot voluntarily at him, it was manslaughter."

That was one of the earliest cases, and was fully considered; and it has been cited in all the books on criminal law since its decision in 1640 (15th Car. I.),—with some incorrectness of statement, in 1 Hale P. C. 458, and in other books adopting Hale's text. This is in some measure rectified by a remark, 1 East P. C. 321–322. See, also, Roscoe Cr. Ev. 758; also 1 Bishop Cr. L. § 858, n. 2 (5th ed.) It is to be specially noticed that what made it manslaughter was, that, in order to defend his castle, it was not necessary to kill the bailiff.

The same idea of *necessity*, in order to relieve the killing from being manslaughter, exists in the case of defending one's person, as stated in Hawkins P. C. 113: " Homicide *se defendendo*

seems to be when one who has no other possible means of preserving his life from one who combats him on a sudden quarrel, or of defending his person from one who attempts to beat him (especially if such attempt be made upon him in his own house), kills the person by whom he is reduced to such an inevitable necessity."

In a learned note in 2 Archb. Cr. L. 225, it is said : " But when it is said that a man may rightfully use as much force as is necessary for the protection of his person and property, it should be recollected that this rule is subject to this most important modification,—that he shall not, except in extreme cases, endanger human life, or great bodily harm. * * * * You can only kill to save life or limb, or prevent a great crime, or to accomplish a necessary public duty. It is, therefore, clear, that if one man deliberately kills another to prevent a mere trespass on his property—whether that trespass could or could not otherwise be prevented—he is guilty of murder. If, indeed, he had at first used moderate force, and this had been returned with such violence that his own life was endangered, and then he killed from necessity, it would have been excusable homicide. Not because he could take life to save his property, but he might take the life of the assailant to save his own."

*Harcourt's* case, 5 Eliz. stated 1 Hale P. C. 485–6, shows that this doctrine is not new. " Harcourt, being in possession of a house by title, as it seems, A. endeavored to enter, and shot an arrow at them within the house, and Harcourt, from within, shot an arrow at those that would have entered, and killed one of the company. This was ruled manslaughter, and it was not *se defendendo*, because there was no danger of his life from them without." What was thus ruled is the key to the author's meaning in the next following paragraph of his book, which see.

The idea that is embodied in the expression that, a man's house is his castle, is not that it is his *property*, and, as such, he has the right to defend and protect it by other and more extreme means than he might lawfully use to defend and protect his shop, his office, or his barn. The sense in which the house has a peculiar immunity is, that it is sacred for the protection of his person and

of his family.   An assault on the house can be regarded as an assault on the person, only in case the purpose of such assault be injury to the person of the occupant or members of his family, and, in order to accomplish this, the assailant attacks the castle in order to reach the inmates.   In this view, it is said and settled that, in such case, the inmate need not flee from his house in order to escape from being injured by the assailant, but he may meet him at the threshold, and prevent him from breaking in by any means rendered necessary by the exigency ;  and upon the same ground and reason as one may defend himself from peril of life, or great bodily harm, by means fatal to the assailant, if rendered necessary by the exigency of the assault.

This is the meaning of what was said by HOLROYD, J., in charging the jury in *Meade's* case, 1 Lewin C. C. 184.   Some exasperated sailors had ducked Meade, and were in the act of throwing him into the sea, when he was rescued by the police. As the gang were leaving, they threatened that they would come by night and pull his house down.   In the middle of the night a great number came, making menacing demonstrations.   Meade, under an apprehension, as he alleged, that his life and property were in danger, fired a pistol, by which one of the party was killed.   Meade was indicted for murder.   Upon that state of facts and evidence, the judge said to the jury: "A civil trespass will not excuse the firing of a pistol at a trespasser in sudden resentment or anger, &c.   *   *   But a man is not authorized to fire a pistol on every intrusion or invasion of his house.   He ought, if he has reasonable opportunity, to endeavor to remove him without having recourse to the last extremity.   But the making an attack upon a dwelling, and especially at night, the law regards as equivalent to an assault on a man's person; for a man's house is his castle ;  and, therefore, in the eye of the law, it is equivalent to an assault; but no words or singing are equivalent to an assault ;  nor will they authorize an assault in return, &c.   *   *   There are cases where a person in heat of blood kills another, that the law does not deem it murder, but lowers the offence to manslaughter ;  as, where a party coming up by way of making an attack, and without there being any

42

previous apprehension of danger, the party attacked, instead of having recourse to a more reasonable and less violent mode of averting it, having an opportunity so to do, fires on the impulse of the moment. In the present case, if you are of opinion that the prisoner was really attacked, and that the party were on the point of breaking in, or likely to do so, and execute the threats of the day before, he, perhaps, was justified in firing as he did. If you are of opinion that he intended to fire over and frighten, then the case is one of manslaughter and not of self-defence."

The sense in which one's house is his castle, and he may defend himself within it, is shown by what is said in 1 Hale P. C. 486, that "in case he is assaulted in his own house, he need not flee as far as he can, as in other cases of *se defendendo*, for he hath the protection of his house to excuse him from flying, as that would be to give up the protection of his house to his adversary by flight." Now, set over against 'that what is said in 1 Russell, 662, and the true distinction between the house as *property*, on the one hand, and as *castle for protection*, on the other, is very palpable, viz : "If *A.* in defence of his house, kill *B.*, a trespasser, who endeavors to make an entry upon it, it is, at least, common manslaughter, unless, indeed, there were danger of life ;" p. 663. "But where the trespass is barely against the property of another, the law does not admit the force of the provocation as sufficient to warrant the owner in making use of a deadly or dangerous weapon ; more particularly if such violence is used after the party has desisted from the trespass." In *Carrol* v. *The State*, 24 Ala. 36, it is said : "The owner may resist the entry into his house, but he has no right to kill, unless it be rendered necessary in order to prevent a felonious destruction of his property, or to defend himself against loss of life, or great bodily harm." Cited 2 Bishop Crim. Law, § 707, 5th ed. That case impresses us differently from what it does the learned author, as indicated by his remark prefacing the citation.

As developing and illustrating the prevailing idea of the law as to what will justify homicide *se et sua defendendo*, it is not without interest upon the point now under consideration, to advert to what is said upon the general subject. In McNally, 562, it is

said : " The injured party may repel force by force in defence of his person, habitation, or property, against one who manifestly intendeth and endeavoreth by violence or surprise to commit a known felony upon either. In these cases he is not obliged to retreat, but may pursue his adversary until he findeth himself out of danger ; and if in such conflict he happeneth to kill, such killing is justifiable." Wharton incorporates this into his work as text. The same is found in the older books. 1 Hale, 485–6 ; also in Foster's Crown Law, 273 ; 1 Russell, 667 ; and in other books, *ad lib.* But, to apprehend this in its true scope and application, it is important to have in mind what is said in 1 Russell, 668 : "The rule clearly extends only to cases of felony ; for if one come to beat another, or take his goods merely as a trespasser, though the owner may justify the beating of him so far as to make him desist, yet if he kill him, it is manslaughter. * * * No assault, however violent, will *justify* killing the assailant under a plea of necessity, unless there be a manifestation of *felonious* intent." See Archb. Crim. Law, 221, cited 9 C. & P. 22.

This covers the cases of statutory justification of homicide, both under our own, and under the English, statutes, and, in principle and in reason, it is in keeping with the common law as to *se defendendo*, in defining the scope of which in this respect, it is well laid down that, " before a person can avail himself of the defence that he used a weapon in defence of his life, it must appear that that defence was necessary to protect his own life, or to protect himself from such serious bodily harm as would give him reasonable apprehension that his life was in immediate danger." 1 Russell, 661.

The law of the subject, as given in the books thus cited and referred to, seems to have been adequately apprehended by the court, and, so far as we can judge from what is shown by the record before us, it was not administered erroneously or improperly in the trial, as against the respondent.

If it were to be assumed that the defense might legitimately claim that there was an assault on the house, with the intent either of taking the life of the respondent, or doing to him great

bodily harm, the respondent would be justified in using a deadly weapon, if it should be necessary in order to prevent the perpetration of such crime, or if, under the existing circumstances attending the emergency, the respondent had reason to believe, and was warranted in believing, and, in fact, did believe, that it was necessary in order to prevent the commission of such crime. In case the purpose of the assailant was to take life, or inflict great bodily harm, and the object of his attack (if there was such attack) upon the house, was to get access to the inmate occupying the same, for such purpose, the same means might lawfully be used to prevent him from breaking in, as might be used to prevent him from making the harmful assault upon the person, in case the parties were met face to face in any other place. In either case, the point of justification is, that such use of fatal means was necessary in order to the rightful, effectual protection of the respondent, or his family, from the threatened or impending peril.

We have been led to this discussion and exposition of the law as to the defense of the dwelling-house, on account of the somewhat fragmentary and disjointed condition in which it is done up in the books and cases of criminal law, and for the purpose of rendering as explicit as we are able the views of this court on that subject, as it has been brought into question and debate in the case in hand. In this exposition, and in the views embodied in this opinion, all the members of the court concur.

The other subjects involved in grounds and points of defense, as shown by the bill of exceptions, and upon which the court gave instructions to the jury, do not seem to require discussion.

The verdict is set aside, and new trial granted.