## KELLY v. UNITED STATES.[1]

*(Circuit Court, D. Maine.   July 7, 1885.)*

1. CRIMINAL LAW—AMENDMENT OF RECORD.
    The circuit court may amend its record, in a criminal cause, after remission to the district court, under Rev. St. § 1037.

2. SAME—FORMER JEOPARDY.
    The discharge of a jury who have disagreed, constitutes no bar to a further prosecution.

3. EVIDENCE—MEDICAL EXPERT.
    It is not necessary to show experience in special cases in order to qualify a surgeon to testify as an expert.

4. SAME—DYING DECLARATION, WHEN ADMISSIBLE.
    It is essential to the admissibility of a dying declaration that it was made under a sense of impending death, and this preliminary fact must be proved by the party offering the declaration in evidence.[2]

5. COURTS—JURISDICTION.
    Offenses committed upon lands purchased by the United States for the erection of forts, with the consent of the legislature of a state, and of which jurisdiction has been ceded to the United States, are within the jurisdiction of the federal courts.

Indictment for Manslaughter.

Dennis Kelly, orderly sergeant, in charge of Fort Popham, was indicted for manslaughter within said fort. He was put upon trial before the circuit court, September term, 1884; the circuit and district judges presiding. The jury reported, through their foreman, that they were and would be unable to agree, and thereupon, by order of the court, were discharged from further consideration of the case. The indictment was certified to the district court for the December term following. The record in the circuit court had not been extended, and the order of court discharging the jury, by inadvertence, had not been minuted upon the docket. In the district court the grand jury presented a new indictment, and a *nolle prosequi* was entered on the indictment which had been certified from the circuit court. To the new indictment Kelly's counsel began to read a plea of former jeopardy; and, while reciting the record of the circuit court as it rested in docket entries, the judge suspended the reading, passed into the circuit court, which was then standing open, directed the correction of the record to show the fact as to the discharge of the jury, and ordered a corresponding correction of the certificate to the district court. Proceedings were then resumed in the district court. A new plea of former jeopardy was presented, reciting the amended record of the circuit court, which was overruled; and, the defendant standing mute, a plea of not guilty was ordered to be entered. Upon the trial other points arose which sufficiently appear in the opinion. After a verdict of guilty and sentence, a writ of error and *supersedeas* of sentence were allowed by the circuit judge.

[1] Reported by A. H. Davis, Clerk U. S. Circuit Court, D. Maine.
[2] See note at end of case.

*H. D. Hadlock*, for plaintiff in error.
*W. F. Lunt*, Dist. Atty., for the United States.

Colt, J. In this case a writ of error was allowed from the judgment of the district court, under the act of March 3, 1879. 20 St. 354. The errors assigned are numerous. We will only consider those which seem to us important.

The second, third, and fourth assignments of errors raise the question of former jeopardy. Kelly was first tried in the circuit court at the September term, 1884, on an indictment for manslaughter. The jury failed to agree, and therefore the case was certified to the district court under section 1037, Rev. St. The order of remission set out that the jury were unable to agree, but did not state that they were thereupon discharged by the court. After the case had been remitted to the district court, the district judge, while sitting in circuit court, ordered the clerk of the circuit court to correct the record so as to conform to the fact, by inserting, after the words "unable to agree," "and were, by order of court, discharged from further consideration of this case." The plaintiff in error contends that his plea of former jeopardy should have been sustained, on the ground that the court had no right to correct the record in the manner stated; and that without such correction the plea of former jeopardy would be good, because, as the record then stood, it did not appear that the jury had been discharged. The district judge sat at the trial of the case in the circuit court. The fact was one within his knowledge, and the knowledge of all present. The omission was a mere clerical one. Under the circumstances we can discover no error in the order to correct the record in accordance with the fact. The power of a court to amend its own record *nunc pro tunc* has long been recognized, and is well established. *Gilmer* v. *Grand Rapids*, 16 Fed. Rep. 708; *Jones* v. *Lewis*, 8 Ired. 70.

The second plea of former jeopardy, raised by the fifth assignment of error, presents a more serious question. To the indictment found in the circuit court a *nolle prosequi* was entered in the district court, and a new indictment found in the district court, upon which Kelly was tried and convicted. Under these circumstances, does the trial and discharge of the jury, without the consent of the prisoner, in the circuit court, constitute a former jeopardy, and so bar further proceedings in the district court upon a new indictment? This precise point, we believe, has not arisen before. It is well settled, however, in the federal courts and in most of the state courts that the discharge of the jury by the court, where they are unable to agree, without the consent of the accused, is no bar to any future trial for the same offense. Bish. Crim. Law, § 1033; *U. S.* v. *Perez*, 9 Wheat. 579. Here the jeopardy is considered apparent, not real, and the case falls within the class which is thus defined by Bishop in section 1030:

"But there are other defects, equally fatal,—defects inherent in the case, though not properly of record,—defects existing in the nature of things, and therefore certain, yet unknown, or even of a nature not to be known, until the evolutions of events bring them to light. And if one of these other defects is found to have lain hidden in the cause when it has opened to the jury, the proceeding, however far it formally progresses, will not bar future proceedings, because it produces in law no jeopardy to the defendant."

The supreme court in *U. S.* v. *Perez*, in deciding the question whether the discharge of the jury by the court is a bar to a future trial, say:

"After weighing the question with due deliberation, we are of the opinion that such a discharge constitutes no bar to future proceedings, and gives no rights of exemption to the prisoner from being again put upon trial."

If a trial, followed by a discharge of the jury, does not constitute a legal jeopardy so as to bar further proceedings, then it is difficult to see how there was any jeopardy in this case by reason of the proceedings in the circuit court under the first indictment. The counsel for the plaintiff in error has filed a very learned and elaborate brief on the subject of what constitutes jeopardy; but, in our opinion, the question narrows itself down to this: whether a former trial and discharge of the jury can be pleaded as a former jeopardy; and if it cannot, then the plaintiff in error in this case cannot set up this bar, and it follows that, as no former jeopardy exists, the prosecution had a right to enter a *nolle prosequi* on the first indictment, and bring another, just the same as if no trial had taken place. The legal necessity for discharging the jury is largely in the discretion of the court. We think it sufficient if the record, as in this case, shows that the jury, being unable to agree, were by order of the court discharged, without setting out specifically the circumstances upon which the order of discharge was based.

The objection is raised to the admissibility of the expert testimony of Dr. Edwin M. Fuller in the sixth, seventh, eighth, and ninth assignments of errors. Dr. Fuller testifies that he was a physician and surgeon, a graduate of Bowdoin Medical College in 1873, and that since graduation he had been in practice at Bath, Maine. We think Dr. Fuller, by reason of his general professional studies and experience, was a qualified expert, without showing any special study or experience on his part of gunshot wounds. Whart. Crim. Law, § 48. Experts in science are permitted to give conclusions drawn as scientific results from any particular *data*, and the questions put to Dr. Fuller relative to the elevation in which the pistol must have been held in order to inflict the wound seem to come clearly within this rule. Whart. Crim. Law, § 821*g; Com.* v. *Lenox*, 3 Brewst. 249.

The assignments of errors from the tenth to the eighteenth, inclusive, relate to the question of the admissibility of the dying declaration of Smith. It is essential to the admissibility of a dying declaration that it was made under a sense of impending death, and this preliminary fact must be proved by the party offering the declara-

tion in evidence. The evidence upon which the paper was admitted was this: The deceased stated, at or about the time the statement was taken down in writing: "It is of no use, I am almost gone;" or, "Oh, dear! have I got to talk? I am almost gone." Dr. Furgerson testified that the morning Smith was shot, and when he was lying on the veranda of Mrs. Haley's house, he said to Mr. Perkins: "I think he cannot live;" and that, in saying those words, Smith opened his eyes and looked up at him, evidently understanding what was said. The fact that Dr. Furgerson's testimony was given in rebuttal cannot be material, assuming the objection on that ground to be well taken, which is by no means clear, in view of the rule that the order in which the evidence is introduced is largely within the discretion of the court, and that no exception lies on that ground. *Com.* v. *Brown,* 130 Mass. 279. It seems to us that the evidence brings the statement of Smith within the rule as to dying declarations, and that it was properly admissible as such.

The respondent's motion to dismiss on the ground that the government had failed to show that the shooting occurred upon land owned by the United States, over which jurisdiction had been ceded by the state of Maine, was denied by the court, and this forms the subject-matter of the twenty-third assignment of error. It is admitted by counsel that Fort Popham, where the shooting took place, stands upon land embraced in the deed from Joshua Shaw to the United States, dated June 21, 1808, and it is clear that the Shaw deed, and the deed from Clark to the United States, dated June 1, 1863, include all the land covered by the fort. The only question is whether the consent of the legislature of the state of Maine has ever been obtained.

By the act of the legislature of Maine of April 17, 1857, jurisdiction was ceded to the United States "over any tract or tracts of land at or near the entrance to Kennebec river, Maine, that may be acquired by the United States for the purpose of carrying out an act of congress of March 3, 1857, providing for the 'erection of fortifications at the mouth of the Kennebec river, Maine,' by building and maintaining thereon forts, magazines, arsenals, dock-yards, and other structures, with their appendages, and over all the contiguous shores, flats, and waters within four hundred yards from low-water mark; and all right, title, and claim which this state may have to or in the said   *   *   *   tract or tracts at or near the entrance to Kennebec river, are hereby granted to the United States."

By the act of the ninth January, 1862, it was enacted by the legislature of Maine "that the United States may hold forever, for the erection and maintaining of a fort thereupon, certain territory situated at Hunnewell's point, at the mouth of the Kennebec river in the town of Phipsburg within the county of Sagadahoc, included within the following boundaries,   *   *   *   and containing five and a quarter acres, with all the buildings, structures, and improvements of ev-

ery kind situated thereon, reserving such jurisdiction as the state has in other places within same, ceded to or held by the United States for similar purposes."

On February 18, 1871, the legislature of Maine passed the following act:

"Section 1. That the consent of the legislature of the state of Maine be, and the same is hereby, given to the purchase by the government of the United States, or under the authority of the same, of any tract, piece, or parcel of land, from any individual or individuals, bodies politic or corporate, within the boundaries or limits of the state, for the purpose of erecting thereon light-houses, and other needful public buildings whatever," etc.

In view of the foregoing acts, we can come to no other conclusion than that the legislature of the state of Maine intended to give its consent to the purchase by 'the government of the United States of the land on which Fort Popham is situated. The supreme court of Maine declined to take jurisdiction in this case. The court held that Fort Popham is a United States fort, and that the purchase was made by consent of the legislature of the state. *State* v. *Kelly*, 76 Me. 331. By the twenty-seventh assignment of errors, it is charged that the court erred in overruling the respondent's motion in arrest of judgment. The first objection urged under the motion in arrest is that the indictment does not state that the land on which the fort stands was purchased by the consent of the legislature of the state of Maine. The first count in the indictment alleges as follows:

"The site of which said fort was purchased by the said United States, and then and there held by and in the possession of the said United States for the erection of a fort, with the consent of the legislature of the state of Maine, in which said state said fort is situated, and which said fort was, at the last mentioned day, then and there a place under the sole and exclusive jurisdiction of the said United States, and within the jurisdiction of this court."

We think this averment of jurisdiction clearly sufficient. The language bears out the construction that the purchase, holding, and possession were all for the erection of a fort, and all with the consent of the legislature of Maine. It is unnecessary to consider in detail this averment in the two other counts. We think, however, the allegation in these counts is sufficient under the statute defining the offense charged. In *U. S.* v. *Gilbert*, 2 Sum. 19, 87, STORY, J., says:

"If the offense is so laid in the indictment as to bring the case within the language of the statute in point of jurisdiction and certainty of description, that is all which can properly be required in our country."

I have carefully examined the numerous questions raised upon the record by the learned counsel for the plaintiff in error, and have considered the more important ones, and the conclusion reached is that there is no error in the proceedings in the district court.

The judgment of the district court is affirmed; the respondent to stand at the bar of this court for sentence.

## NOTE.

Dying declarations, to be admissible in evidence, must be made, not merely *in articulo mortis*, but under the sense of impending death, without expectation or hope of recovery. People v. Abbott, (Cal.) 4 Pac. Rep. 769. See State v. Cantieny, (Minn.) 24 N. W. Rep. 458.

Dying declarations, made under a belief of imminent death, and without hope of recovery, are admissible in evidence, although others thought at the time that declarant would not die, and even though death may not have followed for some time. People v. Simpson, (Mich.) 12 N. W. Rep. 662.

The party signing or making dying declarations must have been in such a state of mind at the time as to have had a clear understanding of the contents of the document he is said to have signed, or of the declaration he is said to have made. Binfield v. State, (Neb.) 19 N. W. Rep. 607.

A dying declaration is admissible in evidence, although not signed by the declarant, and although it was not given in voluntary expressions. but by assenting words to leading questions, provided the declarant was on the point of death, and knew that he was, and was too weak for the mechanical exertion of signing his name. People v. Callaghan, (Utah,) 6 Pac. Rep. 49.

The dying declarations must be as to facts, and not merely expressions of opinions; and their credibility is for the jury, and is to be determined from considerations in connection with all the surrounding circumstances. State v. Clemons, (Iowa,) 1 N. W. Rep. 546.

It was said in People v. Wasson, (Cal.) 4 Pac. Rep. 555, that the expression of the opinion by the declarant that the defendant was the man who shot him, was not admissible.

In People v. Abbott, (Cal.) 4 Pac. Rep. 769, the defendant was taken to the bedside of a wounded man, and the latter declared that he was the man who had wounded him with a knife, and the court admitted this declaration.

In People v. Simpson, (Mich.) 12 N. W. Rep. 662, two women were walking together, and one of them was fatally shot, and immediately after the shot was fired the injured woman exclaimed: "My God, Simpson, you have shot me!" and the court held it to be admissible in evidence.

The competency of dying declarations is restricted to those cases in which the death is the subject of the charge. Railing v. Com., (Pa.) 1 Atl. Rep. 314.

An offer in evidence of dying declarations should be preceded by evidence that they were actually made in expectation of impending death; and this may be shown by the nature of the injury; by what the injured person said, or what physicians or attendants said in his hearing; by the evident state of his mind, etc. It is not essential that the injured person should have said that they were made in the expectation of death, or that any person should have said in his presence, that death must speedily follow. People v. Simpson, (Mich.) 12 N. W. Rep. 662.

In order to make dying declarations admissible in evidence, it is not necessary that the declarant state everything constituting the *res gestæ* of the subject of his statement, but only that his statement of any given fact be a full expression of all that he intended to say as conveying his meaning as to such fact. State v. Patterson, 45 Vt. 308.

In Brown v. Com., 73 Pa. St. 321, where a man, bearing marks of violence, was found dead about 300 yards from his house, and his wife was found in the house, (which had the appearance of having been robbed,) with wounds of which she subsequently died, the court held that the dying declarations of the wife were not admissible in the trial of a prisoner for the murder of the husband.

A man was wounded in a fight with the defendant, and on the same day, while expecting to die, made certain statements in relation to the fight. He lived 10 days longer, and his physicians expressed the hope to him that he would recover, and he said, "I hope so too;" but at last died of the wounds. It was held by the court that evidence of his statements was admissible on trial of defendant for murder. Swisher v. Com., 26 Grat. 963.

Dying declarations are admissible in evidence if the declarant had given up all hope of life, although he did not state that he was expecting to die immediately, and although the same matter had been testified to by the declarant on a preliminary examination of the accused, and that testimony had been properly given in evidence. State v. Wilson, 24 Kan. 189.

Dying declarations are not admissible in evidence if the declarant had the slightest hope of recovery, although he dies within an hour afterwards. People v. Hodgdon, 55 Cal. 72.

The admissibility of dying declarations as evidence is a blended question of law and of fact. They are not incompetent because made in answer to questions by the wife and the physician of the deceased. State v. Trivas, 32 La. Ann. 1086.

Dying declarations are admissible in evidence on a trial for murder, when made in view of impending death and after abandonment of all hope of recovery, as to the facts

and circumstances constituting the *res gestæ* of the homicide, but not as to matters occurring anterior to and not immediately connected with it. State v. Draper, 65 Mo. 335.

Dying declarations, not part of the *res gestæ*, are not competent in exculpation of the accused. Moeck v. People, 100 Ill. 242.

In Boyle v. State, (Ind.) 5 N. E. Rep. 203, the dying declaration of the deceased was taken in the form of questions and answers; and he was asked, "What reason, if any, had the man for shooting you?" to which he answered: "Not any that I know of. He said he would shoot my damned heart out." Held to be admissible, and not the expression of an incompetent opinion.