State v. Center et al.

THE STATE OF VERMONT v. SUSAN CENTER AND W. H. H. CENTER.

*Dying Declarations.   Evidence.   Criminal Law.   Confidential Communications.   Manslaughter.*

Dying declarations, to be admissible in evidence as such, must have been made under the full and firm belief of near and approaching death.

Whether the declarations are made under such belief is to be decided solely by the court.

The interval of six days between the making of the declarations and the date of death, is not of itself sufficient to exclude them as evidence.

At the time of making certain declarations, sought to be introduced as dying declarations, the declarant stated that she knew she should die, but also remarked that *if she lived to get well* she would never go again to the place where the prosecution claimed she received the injury of which she died. At this time she was not regarded as dangerously sick by her physician or attendants. *Held*, that the declarations were not admissible.

Vague and indefinite expressions, and all language which does not distinctly point to the cause of death, and its attending circumstances, but requires to be aided by inference or supposition in order to establish facts tending to criminate the respondent, should be held inadmissible.

A conversation between the respondent and her husband, tending to show an admission of her guilt to him, and overheard by a witness who was in an adjoining room, is not such a confidential communication, as the law excludes as evidence.

If a man, in order to have unlawful sexual connection with a female, by her consent, uses artificial means to make such connection practicable, and by carelessness or negligence in the use of such means, inflicts upon her a wound which causes her death, he is guilty of manslaughter; as is also another person, who assists him in the use of such means, with knowledge of the purpose thereof.

INDICTMENT for the murder of Martha Wheeler. Plea, not guilty, and trial by jury, at the September Term, 1860, POLAND, J., presiding.

The respondent, Susan Center, was step-grandmother of Martha Wheeler, and the other respondent was her son, and half-brother of the mother of Martha Wheeler.

The respondents resided with Dearborn Center, husband of Susan Center, and father of the other respondent, in Cabot.

Martha Wheeler was nearly fifteen years old, and a very large, healthy girl, and her parents lived in Albany, in Orleans county. In April, 1860, Martha Wheeler came to Cabot to live in the family of a Mr. Hoyt, as a hired girl, Hoyt being a farmer, and living near the respondents. From the time Martha Wheeler came to Hoyt's she was very friendly with the respondents, often going there, and usually spending some portion of every sabbath at their house; but this was not approved by her mistress, Mrs. Hoyt, and she requested Martha not to visit the respondents on Sundays. On Sunday, the 1st day of July, 1860, near evening, Martha Wheeler went to the house where the respondents lived, and did not return to Hoyt's until late in the evening, the precise time did not appear. The next morning she assisted in the work, and then went to Cabot village to see a caravan, which was exhibited there that day, and returned to Hoyt's at night, and assisted in milking.

In going to the caravan she rode with Mr. Hoyt's family as far as her grandmother's, where she stopped and rested with them. There was some evidence that on that day she exhibited appearances of approaching illness, that she complained of being tired, and did not appear to be interested in the exhibition, but there was no evidence that she made any complaint of illness, or pain, or injury.

On Tuesday morning she arose, and went about her work, but soon complained of head-ache and dizziness, when Mrs. Hoyt had her go to bed, and gave her medicine for a cold, which she supposed to be the difficulty with her. She continued to grow worse until Saturday of that week, when Dr. Goodwin, of Cabot, was called to visit her, who pronounced her disease to be *Typhoid* fever, and for which he treated her. She continued, however, to grow worse, and on the evening of the following Friday she died. It appeared that during her sickness, she had bloody discharges from her private parts, quite offensive in smell, that she appeared stiff in the region of her hips, and unable to move her limbs, and had great difficulty in voiding urine.

The body of the girl after her decease was taken to Albany, and there buried, and on the 6th of August following, it was

disinterred and examined, to ascertain the cause of her death. Dr. M. P. Wallace, of Cabot, one of the physicians present at the examination, was called as a witness, and testified that " the private parts of the girl were swelled externally. On opening those parts we discovered what we called a wound, and examined it. The swelling was on the right side of the *labia*, the inner lip was swollen so that it protruded; the wound was about opposite the *hymen*, 1-4th to 1-2 inch one side of vagina, or entrance of the womb, where it commenced. I probed the wound ; the probe passed half its length, at least three inches in depth. Then I dissected the parts, removed the *Pubic bone* so we could see the womb. The wound kept on the outside of the passage to the womb, in an oblique direction. It was a simple flesh wound, hit no blood vessel. We came to the unanimous conclusion, that the wound must have been produced by violence, with some blunt instrument to us unknown. We examined the stomach, bowels, and liver, and all appeared healthy, and we found no other cause of her death, except this wound. The wound was below the *urethra*, and to the right. The opening of the wound was about the same size as that of the *urethra*. The bottom or base of the wound appeared to be larger than the entrance. It appeared as if the instrument had been worked up and down, or inserted twice, and not following the same track both times. The *Hymen* was lacerated, and broken ; the injury appeared to be recently done, as shreds of it remained very unyielding and tough. As we found the hymen, there was no obstruction to an entry, but before it was ruptured, we were satisfied no man could have entered in the natural way. All by which we could tell whether she had ever had connection, was the rupture of the hymen. There was no appearance of pregnancy, or that there ever had been. We concluded it was a wound, and not an abscess, a puncture, made with an instrument, and that if left, wholly unattended, it would be likely to produce death."

It was claimed on the part of the prosecution that the respondent, Harrison Center, in the evening of that 1st of July, aided by his mother, attempted a forcible violation of the person of Martha Wheeler, but that her natural condition was such that

he was unable to effect a penetration, and that for the purpose of enabling him to accomplish his purpose, he, with the aid of his mother, attempted to make a forcible penetration of the hymen with some instrument, but that by reason of Martha's resistance and struggles, the wound or incision found on her person was made, and that the same caused her death.

No direct evidence was introduced tending to prove that the wound was given by the respondents, or either of them, or the purpose of it, but a great variety of circumstances, in the acts and declarations of each of the respondents, were proved, which were claimed to tend towards proving them guilty as claimed.

The government in support of the prosecution relied on certain declarations of Martha Wheeler made, during her sickness, to Ann Lyford, and Mrs. Wheeler, her mother. Ann Lyford testified, that she went to Mr. Hoyt's, on Friday, July 6th, to nurse Martha, and took care of her till Monday following. That on Friday and Saturday Martha said she knew she should die, and on Sunday said she knew she was doomed to die ; that on Saturday she conversed with Martha about the cause of her sickness, and asked her why she was so sore and stiff, and Martha replied, that she supposed she had taken cold. The prosecutor then proposed to prove by the same witness, that on the same Saturday, she pressed the same inquiry upon Martha, and that Martha said in reply, " that if she had minded Mrs. Hoyt and staid at home, she should not have been sick as she was now." This statement was objected to by the respondent's counsel, as not admissible, because not made under such expectations of impending death by Martha, as to make her declarations admissible, and also because the declaration itself was of so general and vague a character. But the court overruled the objection and admitted the evidence, to which the respondents excepted. The witness then stated the declaration of Martha to her, according to the offer, and also added, that Martha said further, " that if she lived to get well she would never go there again." It appeared from all the evidence in the case, that at the time of these declarations, Martha

State *v.* Center et al.

was not considered by her physicians and others to be danger-
ously sick.

Mrs. Wheeler, the mother of Martha, testified as follows :
" I first saw Martha, after her sickness, on Thursday even-
ing, July 12th, and remained with her till she died, about
twenty-nine hours. Martha understood she could not live,
and gave me some directions about the distribution of some
of her things to the other children. On Friday evening
before she died, she appeared to be in great distress. I
asked her where the pain was ? she could not talk very well ;
she put my hand and her hand on her private parts, and began
to cry. I then examined, saw she was badly swelled, very bad.
I saw she was badly injured, and examined to see, tried to
examine, but it hurt her so I could not. I told her my step-
mother was the cause of this. She looked up in my face and
said, ' Harry—Harry.' That was all she said that I could
understand. Harrison Center goes by the name of Harry."
The above reply of Martha to her mother was also objected
to for the same reasons, as her declarations to Ann Lyford,
but the same was allowed to go to the jury, to which the
respondents excepted.

John H. Damon testified, " I was the officer who arrested the
respondents, and committed them after they were bound over for
trial by a magistrate. After they were bound over, Mrs. Center
wanted to go home to make some arrangements about her affairs,
and I carried her to her house. I sat in the kitchen ; Mrs.
Center and her husband were in another room, arranging about
their things. There was a small entry between the rooms, but the
doors were open. Mr. Center spoke, and said, ' *It is too bad !
too bad !*' Mrs. Center replied, ' *Who is to blame ?*' Mr. Center
said, ' *I don't know,*' Mrs. Center said, ' *Captain ! Captain !
if it had not been for you, this would never have been known !*' Mr.
Center replied, *that he knew he talked a great deal.* There were
no persons in the room except Mr. and Mrs. Center." This
evidence was objected to by the respondents, as being confiden-
tial conversation between husband and wife, but the same was
admitted, to which the defendants excepted.

The respondents' counsel claimed that where dying declarations are admitted as evidence, (there being proof tending to show that the person making them is under the expectation of immediate death,) still it was ultimately a question for the jury to pass upon, whether such expectation of death existed or not, and in relation to the declarations of Martha Wheeler, above recited, the court instructed the jury, that in order to make such declarations admissible as evidence, it must be satisfactorily established, that Martha Wheeler, at the time of making them, had no expectation that she should recover, but that she must very soon die, and that if the jury thought from the evidence that she did not so expect and believe, then those declarations should be laid out of the case, and not weighed at all. No exceptions were taken to the charge upon this evidence, but the respondent's counsel claimed, that the court should have excluded it from the consideration of the jury.

The respondents excepted to the following portion of the charge to the jury:

The court told the jury that if they found, that Martha consented to have sexual connection with the respondent, Harrison Center, but in consequence of her condition he was unable to effect a penetration, and she consented that the respondents might use artificial means to perforate the hymen, and they did so, and thereby gave her a wound that caused her death, though not intending it, still it would be manslaughter, if they were guilty of such carelessness and negligence, either in the manner of doing it, or the instrument used for that purpose, as endangered the life or personal safety of the girl.

The jury found both defendants guilty of manslaughter.

*Peck & Colby*, for the respondents.

*H. W. Heaton*, state's attorney, for the prosecution.

ALDIS, J. Dying declarations are admitted in cases of homicide, both from necessity, and because the near approach of death is supposed to impress the mind with as solemn an obligation to speak the truth, as would the administration of an oath.

State *v.* Center et al.

The state of mind of the person making such declarations, is to be regarded ; it must be that he really believes that he is soon to die. Some of the cases directly decide that he must have no *hope* left of recovery, and such is the general tenor of the books. A late decision in New York, 2 Wheeler's Crim. Cases 398, *People* v. *Anderson*, seems to hold that a mere, faint, lingering *hope* of recovery should not exclude the declaration. Without entering upon any nice inquiry, whether such a hope may coexist with the settled belief of impending dissolution, we think it best to follow the old and settled rule, that the declarations must be made under the full and firm belief of near and approaching death.

We may well question whether the solemn impression, which impending death brings upon the mind, would not be materially lessened by any hope of recovery, however slight; 3 C. & P. 598 and 629.

Whether the declarations were made under such belief, is a question for the court to decide. It is not enough that the evidence tends that way. The court may not for that reason admit them, and leave it to the jury to decide whether they will or will not regard them But the court is in the first instance to be satisfied by the proof that the declarations were so made as to justify their introduction as evidence.

In the case at bar, the opinion of the court on this point is not expressed, but the facts are stated, and they remain for us to decide whether in law they are sufficient.

I. As to the declarations to Ann Lyford. They were made on Saturday, and the young girl who made them died on the next Friday. The length of time that elapsed between the declarations and the decease of the person making them, we do not deem a fatal objection. Death may be believed to be imminent, and yet be long deferred. Cases are referred to in the elementary works on criminal law, where "eleven days" and "several weeks" were not held so great an interval of time as to exclude the evidence. It is the state of mind of the party who makes the declarations, that furnishes the test of admissibility.

She said "she knew she should die." Such expressions

standing alone would ordinarily be entitled to great weight, and warrant the admission of the evidence. They might, however, under some circumstances, be regarded as expressions wrung from a person by physical pain,—or utterances of anxiety and alarm, made to hasten or secure sympathy and aid, rather than the language of real conviction and belief. But here they do not stand alone. She said further, "that if she lived to get well, she would never go to Mrs. Center's again." This expression shows the hope, if not the expectation, of recovery. When taken in connection with the further facts—that the physician was called in on that day for the first time, that he said she was sick of typhoid fever, and that neither he nor others thought her dangerously sick, we think the evidence ought to have been excluded.

2. The declarations to Ann Lyford, and to her mother, made the day before she died, are objected to upon another ground—that they are too vague, and do not point distinctly to the cause of her death. We think this objection tenable. To Ann Lyford she said, when asked about the cause of her sickness,—"that she supposed she had taken cold," "that if she had minded Mrs. Hoyt and staid at home, she should not have been sick as she was now," "that if she lived to get well, she would never go there, (to Mrs. Center's,) again." None of these expressions indicate that any such injury had been inflicted upon her as the theory of the prosecution supposes. It is only by remote inference—by conjecture, that they can be made to have even a seeming connection with any wrongful act as the cause of her death. They are entirely consistent with her dying by natural disease—by catching cold, as she said. The last expression, that she would never go there again, may most reasonably refer to her regret at having disobeyed Mrs. Hoyt, and her intention to obey her in future.

When her mother, referring to her sickness and its cause, said to her, " my stepmother," one of the respondents, " is the cause of this," she said, " Harry, Harry," referring to the other respondent. Now if this had been all she said, it would not be unreasonable to understand that she meant that Harry was the cause of this, and thus the declaration, in connection with the

25

other evidence, would have been admissible. But the witness says further, " that was all she said that I could understand," implying that she said more in the same connection, which she could not understand. Now the rest of the sentence, if it could have been understood, might wholly have exculpated Harry from all connection with the cause of her death. We can not . tell what she did say, nor what she meant by the words that were understood. The prisoner is entitled to the benefit of the doubts which thus arise.

The rule that dying declarations should point distinctly to the cause of death, and to the circumstances producing and attending it, is one that should not be relaxed. Declarations at the best are uncertain evidence, liable to be misunderstood, imperfectly remembered, and incorrectly related. As to dying declarations, there can be no cross examination. The condition of the declarant, in his extremity, is often unfavorable to clear recollection, and to the giving of a full and complete account of all the particulars which it might be important to know. Hence all vague and indefinite expressions—all language that does not distinctly point to the cause of death, and its attending circumstances, but requires to be aided by inference or supposition, in order to establish facts tending to criminate the respondent, should be held inadmissible.

The conversation between Mr. and Mrs. Center, overheard by a witness who was in an adjoining room, does not belong to that class of confidential communications which the law excludes.

As to the remaining point—the charge of the court as to the negligence which would make the respondents guilty of manslaughter, while engaged in the perpetration of an indecent and immoral act, we are satisfied that it was entirely right. The case of *Rex* v. *Van Butchell*, 3 Carr. & P. 629, has no application. That was the case of a physician performing an operation upon a patient, with *intent to cure* him. He was engaged in a lawful employment, and endeavoring to render a beneficial service to his patient. Here the act was unlawful, if not criminal.

Judgment reversed, and case remanded for a new trial.