STATE *v.* RANDALL TUBBS.

May Term, 1927.

Present: WATSON, C. J., POWERS, SLACK, and MOULTON, JJ., and THOMPSON, Supr. J.

Opinion filed January 10, 1928.

*Laurence, Stafford & Bloomer* for the respondent.

*J. Ward Carver*, Attorney General, and *Lawrence C. Jones*, State's attorney, for the State.

THOMPSON, Supr. J. The respondent was indicted and convicted of murder in the second degree for killing one Sam Carrara.

On May 31, 1926, the respondent lived with his son Frank on a farm in Ira called the "Tubbs farm," or the "Perry farm." Sam Carrara and his brother Donato were Italians who cut wood for a living. They spoke broken English. In the early morning of May 31, 1926, they were seen going in the direction of the Tubbs farm. They had two axes tied together, a cross-cut saw, and two dinner pails with them. These were found later on or near the piazza of the house on the Tubbs farm. Soon after eight o'clock in the morning the Carraras were seen at the Tubbs farm in the company of the respondent. They were not see again by anyone other than the occupants of the farm until after five o'clock in the afternoon, when they were found lying on the dirt floor of the carriage shed on the Tubbs farm, a short distance from the house. Donato Carrara was dead. He had several abrasions and wounds on his face and head, among which was a puncture of the nasal septum that suggested a nail hole. He died from asphyxia caused by blood entering the respiratory tract from the nose and possibly from the mouth. Sam Carrara was lying near Donato and was unconscious. His left jaw was fractured, there were three fractures of his skull, both eyes were black, a part of his right ear was gone, probably caused by a sharp instrument, and there were scattered abrasions over the face. He was taken to the hospital at Rutland that evening and died there the next morning. He died from a fracture of the skull due to external violence with intracranial hemorrhage.

It appeared that after the bodies were found the respondent told different persons on different occasions that he struck each of the Carraras one blow with his fist, that he hit them because they were trying to run his business. The evidence tended to show that one blow from a man's fist could not cause any one of the fractures of Sam's skull. It further appeared that at no

time before the trial did the respondent claim that he acted in self-defense.

It appeared that Sam Carrara and one of his brothers bought a cow from the respondent in the fall of 1925. The State's evidence tended to show that this brother was Antonio Carrara and that they never had any trouble with the cow. The respondent's evidence tended to show that this brother was Donato, and the respondent claimed that they were dissatisfied with the cow.

The respondent was a witness in his own behalf and testified that Sam and Donato Carrara arrived at his place about eight o'clock in the morning; that they asked what he would take for a certain heifer and he said ninety dollars, to which they replied that they would give fifty dollars, and he said he would not take less than ninety dollars; that nothing more was said about the heifer until just before the trouble started; that the Carraras had about a pint of alcohol split with them, and he and they spent the greater part of the forenoon in the carriage shed visiting and drinking the alcohol split and about two quarts of strong home-brew beer which he had made. and during this time they had no trouble or dispute about anything; that between twelve and one o'clock, and soon after all the liquor was drunk and while they all were in the carriage shed, Donato said to him, "That other cow you sell me no good, she got bad teats and fence jumper, you no sell me that other hef for fifty dollars now me lick you"; that he said, "You fellows get to hell out of here," motioning toward the door; that Donato then struck him on the forehead; that he dodged his head a little and came up and struck Donato in the face under the eye with his fist and Donato went over against the side of the shed and fell; that he hit him only one blow and could not say whether he ever got up; that then Sam grabbed him and said "I kill you, you son of a ——"; that they had a rough and tumble fight on the floor where he punched Sam in the face a few times with his left hand; that he broke away from Sam and got up and saw that Sam had a stake iron in his hand; that Sam struck at his head, and he ducked his head, and Sam hit him on the back between the shoulders; that he then swung around and caught Sam under the jaw with his fist and knocked him down; that he then glanced to see if Donato was getting up to jump on him,

and he saw that he was not, that he was rolling on the ground; that Sam was attempting to get up on his hands and knees, and he kicked him in the head back of the right ear; that he then left them where they were, and in a short time reported to Guy Fish, the town constable, the trouble he had had.

The deceased arrived at the hospital about eight o'clock in the evening. He was unconscious and in a dying condition. Of the fractures of his skull there was one back of each ear and a third in the back of the skull between the other two. Dr. C. F. Ball, a physician and surgeon, who attended him, applied ice bags to his head soon after he arrived at the hospital, and in about an hour his mental condition improved, and he recovered consciousness and continued conscious until some time the next morning.

Between half past nine and half past ten that evening several persons, who were called by the State as witnesses, were in the room where the deceased was and talked with him, and, subject to the objection and exception of the respondent, statements made at that time by the deceased to the witnesses about the trouble at the Tubbs farm were received in evidence as his dying declarations.

The respondent objected to the admission of such declarations on the ground that they were hearsay. The admission of dying declarations is one of the exceptions to the rule against hearsay evidence, and, under certain conditions, such declarations have always been admitted in cases of homicide, both from necessity and because the near approaching death is supposed to impress the mind with as solemn an obligation to speak the truth as would the administration of an oath. *State* v. *Center*, 35 Vt. 378.

Further objections were made that no foundation had been laid for the admission of the statements as dying declarations, and that from the evidence in the case it had not been shown that the mental condition of the deceased was such that his statements were admissible.

While the general rule is that, to make dying declarations admissible in evidence, they must be made under a consciousness on the part of the declarant of impending death, yet the rule is stated variously. The rule in this State is that to make such declarations admissible in evidence they ''must be

made under the full and firm belief of near and approaching death." *State* v. *Center, supra.* Such belief may be inferred not only from the statements of the deceased but also from his statements and the nature of his wounds and other circumstances combined. *Mattox* v. *United States,* 146 U. S. 140, 13 Sup. Ct. 50, 36 L. ed. 917; *Kehoe* v. *Commonwealth,* 85 Pa. 127; *State* v. *Dalton,* 20 R. I. 114, 37 Atl. 673; *Vass* v. *Commonwealth,* 3 Leigh, 786, 24 A. D. 695. If the question is not raised, the presumption is that the declarant was sane when the declarations were made, but, when the question is raised, the sanity of the declarant must be satisfactorily proved.

Dr. Ball testified that when he first saw the deceased he was unconscious; that he talked with him but could get no response; that about a half hour after the ice bags were put on his head his mind began to clear, and when his mind first began to clear his conversation was somewhat halting and broken; that after his head cleared he responded to requests and asked for water and "acted normally, as near normal as anyone could"; that he questioned him to find what his mental condition was; that his physical condition was desperate, and it was his opinion that the deceased was aware of the seriousness of his condition; that the deceased was "entirely himself" when he and the other witnesses talked with him.

Dr. R. E. Smith, a surgeon, attended the deceased while Dr. Ball and the other witnesses were there. He talked with him and in the conversation the deceased said "My brother dead, guess me be dead pretty quick." He also testified that in his opinion the deceased realized the seriousness of his condition, and, in response to a remark by the court, said: "We draw our impressions, your honor, of course from judging how an ordinary individual would react to things, and his injuries were such any normal man must have known he was in a dying condition, then in addition to that he made his statement relative to his brother and himself." He further testified that when he talked to the deceased he seemed to comprehend the questions asked him, his answers were logical, and, in the witness' opinion, he was rational.

The deceased and his brother Donato had formerly worked for Patrick McCormack. Mr. McCormack saw him at the hospital that evening. After greeting the deceased he asked him

if he knew who he was, and he replied "Yes." He then asked him who he was, and the deceased replied "Mr. Pat." As he was leaving the room the witness said "You will be all right, Sam," and the deceased replied "Oh no, me die."

George Jones, a lawyer, was acting for the State's attorney. He saw the deceased that evening and talked with him. In the course of the conversation he asked the deceased how his brother Donato was, and he replied, "He dead, me die too."

Lorenzo Carrara, a brother of the deceased, saw him at the hospital when Mr. McCormack was there. He talked with the deceased in Italian, and some of the replies were in Italian and some in English. He asked him how he felt and he said "I pretty near half dead." The deceased further said that he didn't feel good and didn't want to talk too much.

The respondent claims that the testimony of Lorenzo Carrara as to the statements made by the deceased was inadmissible because "it lacks the qualifications of the certainty of death, speediness of death, and completeness."

In his brief the respondent says that the deceased said "that he expected to see the witness the next day." On cross-examination the witness was asked: "Q. When you left the hospital that night with Pat you expected to see Sam in the morning? A. Ayuh. Q. Didn't you, and you told Sam you would be back to see him? A. Yes, I told Sam I would be back to see him. Q. And did Sam expect to see you? A. Yes. Q. If you know from what he said? A. Yes. He said to me in Italian, he says, 'Bona sera' in Italian, he said in Italian. Q. What does that mean in English? A. He says 'be all right.' Q. In the morning? A. In the morning." This is the only testimony on this subject, and it does not support the statement of the respondent.

The statement "I pretty near half dead," made by the deceased to Lorenzo, standing alone might not be sufficient to support a finding that the deceased had a full and firm belief of approaching death at the time he made the statements, but the testimony was admissible for consideration by the court with the other evidence in determining that question.

The respondent further says that the court erred because it did not find that a foundation had been laid for the admission of the dying declarations before receiving them in evidence.

16

■ Before dying declarations are admissible in evidence the court must find that, at the time they were made, the declarant was sane, if that question is raised, and that they were made under the belief of near and approaching death. The court below made no express finding of these facts before receiving the statements made by the deceased. These statements were made within a short time of each other, and while the mental condition of the deceased remained the same, and while most, if not all, of the witnesses were in the room where he was lying. The record shows that the court held that the foundation for the dying declarations must be laid before they could be received in evidence.

■■ The first witness to testify as to the dying declarations was Patrick McCormack. His testimony, hereinbefore quoted, as to the statements made by the deceased to him and the evidence then in the case as to the nature of the deceased's wounds were sufficient to support a finding that the deceased was then sane and that he believed that he was about to die. With such evidence in the case, the court, by receiving the dying declarations in evidence, tacitly found that the foundation for their admission had been laid, and this finding is not revisable. *Barney's Admx.* v. *Quaker Oats Co.*, 85 Vt. 372, 395, 82 Atl. 113. Other evidence on this question which was received later supported the finding by the court.

The court received the evidence on the preliminary question of the deceased's mental state in the presence of the jury. The respondent objected on the ground that, if the declarations of the deceased should be excluded, this evidence might prejudice the jury. The court overruled the objection and allowed the respondent an exception, saying that the evidence "ought to be heard by the jury for, if this dying declaration should be finally admitted, it might be of great help to the jury to know the circumstances under which it was made."

■■ Since the proper foundation for the admission of the dying declarations was a preliminary question for the court alone to decide, the court, when the respondent requested it, should have retired the jury while the evidence on that question was being received, for, if the court failed to find that the proper foundation had been laid, the evidence would not be admissible for consideration by the jury. But in this case the

refusal of the court to retire the jury was not reversible error. Since the court found that the proper foundation for the admission of the dying declarations was laid, the respondent was not prejudiced by this ruling, for, with that finding in the case, the evidence of the mental state of the deceased at the time he made the dying declarations was admissible to be considered by the jury with the other evidence in the case in determining what weight or credit they would give to such declarations. *State* v. *Patterson,* 45 Vt. 308, 12 A. R. 200.

In some instances, and this is one, the better way is for the trial court to retire the jury during the investigation of such preliminary matters, and then, if a proper predicate for the evidence is laid, to re-admit such of the evidence as is proper for the consideration of the jury. See *Couch* v. *State,* 93 Tex. Crim. 27, 245 S. W. 692, 25 A. L. R. 1359, 1365.

The respondent further objected to the admission of the dying declarations on the grounds that they, or a part of them, were taken through an interpreter, and that they lacked completeness.

The statements made by the deceased were in answer to questions asked him by the different witnesses.

Dr. Ball asked him what had happened, and he replied that he was hit by a stone; If it was an old man that hit him? and he said ''No,'' it was young man that hit him first and then both of them hit him; If he had been drinking before he went to the farm on the hill? and he said ''No,'' he hadn't, that he got it there.

Dr. Smith asked the deceased where he received his injuries, and he replied, ''On the farm up on the hill; ''What farm?'' and he said, ''The old man's''; ''What old man?'' and he said, ''Tubbs''; ''Who hit you?'' and he said, ''The old man and his boy''; ''What old man?'' and he said, ''Tubbs''; ''What did they hit you with?'' and he said, ''Stones, I guess''; ''Why didn't you get away, or run away?'' and he said, ''I tried to run away, no can do.'' He also told Dr. Smith that they had nothing to drink until they got to the farm and then they had beer.

George Jones asked him where the trouble happened, and he said, the ''Tubbs farm''; ''Who he had the fight with?'' and he said, ''Old man hit me''; ''What old man?'' and he said, ''Tubbs.'' He was then asked if that was all, and he said,

"Young fellow, Frank." He was asked what they hit him with, and he said, "Frank hit me, I know no more." The next morning he told Jones that both the respondent and his son Frank hit him, but he did not know what they hit him with the second time.

Lorenzo Carrara testified that in answer to his questions the deceased told him in Italian that the respondent gave him some beer to drink, and both of them, "the old man and the boy" hit him.

Patrick McCormack testified that, in response to questions asked him in Italian by Lorenzo Carrara, the deceased answered one question "Beer," another question "Perry farm," and another question "Tubbs"; that, in answer to a question as to who hit him, he said either "man and son" or "man and boy," he couldn't recall which. The witness did not give the questions asked the deceased.

The witnesses Ball, Smith, and Jones testified that the statements made by the deceased to which they testified were made in English in response to questions asked in English by them, and that none of those questions and answers were asked or received through an interpreter.

The witness McCormack testified that some of the questions asked the deceased and some of his answers to which he had testified were in English, and some were in Italian, which were translated into Italian or English by Lorenzo Carrara.

■ If there was error in the admission of the statements made by the deceased which were taken through the interpreter (which we do not decide), the error was harmless, because similar statements made by the deceased, which were not disputed, and which were not subject to this objection, were received in evidence. *Tyrrell* v. *Goslant*, 93 Vt. 63, 106 Atl. 585; *Wellman* v. *Mead*, 93 Vt. 322, 107 Atl. 396.

■ The fact that the dying declarations were made in response to questions is no objection to their admission. *Rex* v. *Fagent*, 7 Car. & P. 238; *Vass* v. *Commonwealth, supra.*

■ The rule that dying declarations must be complete does not mean that all of the affair of the death must be related. It means that the statement must be complete as far as it goes. If a dying person finishes the statement he wishes to make, it is no objection that he has told only a portion of what he might

have been able to tell. 2 Wigmore § 1448; *State* v. *Patterson,* supra.

In *State* v. *Patterson,* this Court, referring to the rule as stated in 1 Greenl. Ev. § 159, that "whatever the statement may be it must be complete in itself, for, if the declarations appear to have been intended by the dying man to be connected with, and qualified by, other statements which he is prevented by any cause from making, they will not be received," said: "What we understand by the expression that the statement 'must be complete in itself,' is not that the declarant must state everything that constituted the *res gestae* of the subject of his statement, but that his statement of any given fact shall be a full expression of all that he intended to say as conveying his meaning as to such fact. This is plainly indicated by the closing part of the above quotation, as to the declarations made being intended by the dying man to be connected with and qualified by other statements which he is prevented from making."

█ The statements of the deceased were responsive to the questions asked. The facts were few and simple about which he undertook to speak, and there is nothing in their nature that would seem to require anything more to have been said in order to get the meaning that he intended to convey in respect to them. The exceptions to the admission of the dying declarations are overruled.

██ Malcolm Bronson was a witness called by the respondent. He testified that between six and seven o'clock in the morning of the day of the homicide he met the deceased and his brother in a road in Ira; that he had some talk with them with reference to where they were going and with reference to the respondent. He was then asked: "Won't you go ahead and tell us what talk you had with them at that time?" On objection being made, counsel for the respondent, in substance, stated that they offered to show that on this occasion the witness had some talk with the deceased and his brother and learned that they were on their way to the Tubbs farm, and "he had some talk with them in reference to their feelings with respect to the Tubbs, and in respect to a certain cow transaction which they at that time said to him was an unsatisfactory transaction, and that they made statements showing animosity and hatred to the Tubbs, those statements being in the nature of threats, and that

they then left him and went in the direction of the Tubbs farm"; that this was offered on the theory "that, where, on a charge of homicide, the excuse is self-defense and the controversy is whether the deceased was the aggressor, the deceased's threats against the accused are relevant"; and it was also offered "in connection with the testimony of the witness Tony Carrara wherein he states that the cow which was purchased at the Tubbs farm was satisfactory." The question was excluded and the respondent was allowed an exception. No offer was made of what the testimony of the witness would have been had he been permitted to answer the question. Since there is nothing in the record to show what the answer of the witness would have been if he had been permitted to testify, this Court cannot say that the respondent was prejudiced by the exclusion of the question. The respondent states in his brief, and his counsel stated in oral argument, that it could have been shown by the witness that the deceased and his brother told him that they were going to the Tubbs farm for the purpose of "getting even with him (the respondent)," for the purpose of "beating him up," "licking him," but this does not appear in the record. This Court is bound by the record (*Halloran* v. *New England Tel. & Tel. Co.*, 95 Vt. 273, 115 Atl. 143, 18 A. L. R. 554), and the burden is upon the respondent to produce in this Court a record from which error appears. *Randall* v. *Beryl Lumber Co.*, 95 Vt. 158, 113 Atl. 872.

The rule is well settled that, when objections to a question are sustained, except on cross-examination, if it is desired to reserve the question as to the competency of the testimony sought to be introduced for the determination of this Court, the record must contain some showing as to what the testimony of the witness would have been had he been permitted to answer the question. Otherwise this Court cannot determine as to whether the excepting party has been prejudiced by the ruling of the trial court. *State* v. *Noakes,* 70 Vt. 247, 40 Atl. 249; *Carpenter* v. *Willey,* 65 Vt. 168, 26 Atl. 488; *Nichols* v. *Central Vt. Ry. Co.,* 94 Vt. 14, 109 Atl. 905, 12 A. L. R. 333; *Hovey* v. *Cook,* 83 Vt. 458, 76 Atl. 144; *White* v. *State,* 4 Okl. Cr. 143, 111 Pac. 1010; *People* v. *Duncan,* 315 Ill. 106, 145 N. E. 810; *Commonwealth* v. *Perry,* 254 Mass. 520, 150 N. E. 854; *Davidson* v. *Commonwealth,* 214 Ky. 205, 282 S. W. 1090; *Gates* v. *State*

(Ark.), 283 S. W. 12; *People* v. *McGann,* 194 Cal. 688, 230 Pac. 169.

In *White* v. *State,* the respondent, who was on trial on a charge of homicide, was asked to tell the jury what threats, if any, which were said to have been made by the deceased, were communicated to him, "what the deceased would do with him." The question was excluded. No offer was made of what the witness' answer would be. The Court, in holding there was no reversible error, said: "When the defendant attempts to prove threats against him and objections to the question asked the witness are sustained, it is the duty of counsel for the defendant to incorporate in the record a statement as to what he expects to prove by the witness if allowed to testify. This Court would then be in a condition to determine whether or not such offered evidence was material or proper. To reverse a case simply because a witness was not permitted to answer when there is no showing in the record that such answer would have been favorable to the defendant is to trifle with the law." This exception is unavailing.

John Hayes, a witness called by the respondent, testified that in April, 1926, he met the deceased and his brother Donato and had a conversation with Donato about a cow Donato had purchased. He was asked: "Did you have some further talk with Donato Carrara or Sam Carrara with reference to their attitude toward Randall Tubbs?" The question was objected to, and the same offer was made as was made with reference to the testimony of the witness Bronson. The question was excluded and the respondent was allowed an exception. For the reasons given for sustaining the exclusion of the question asked the witness Bronson this exception is unavailing.

The respondent excepted to the submission of the dying declarations to the jury; but, as these declarations were properly received in evidence, they were properly submitted to the jury to be considered by them with the other evidence in the case.

Exception' was taken to the definition in the charge "of second degree murder and its restriction wherein it leaves out the distinction in the elements of an affray, that a killing in an affray and in the heat of passion, that the charge so leaves it that that could be construed as second degree murder, and it was our notion that a killing in an affray or heat of passion

wouldn't be any more under circumstances of this case than manslaughter.''

In his brief the respondent says that: "It was the duty of the court to fully charge on this subject of death by reason of a blow struck in an affray or in heat of passion," etc; that "there was no showing of previous malice on the part of the respondent, and if, in a mutual combat arising without previous malice, mutual blows are given, and then the respondent in the heat and fury of the fight deals a mortal blow, even with the purpose of taking life, the offense is only manslaughter.''

While it is doubtful if the point made in the brief is raised by the exception to the charge, we have considered it. The evidence did not warrant a charge on the subject of death resulting from a blow struck in the heat of passion while engaged in mutual combat. No claim was made below that the fatal blow was thus struck. The respondent claimed that whatever he did was done in self-defense. He testified that from the beginning to the end of the fight he used no more force than he thought was necessary to protect himself under the circumstances, and that he kicked the deceased in the head because "he threatened to kill me, and I was afraid they would kill me, both of them.''

Exceptions were taken to the court's refusal to charge according to respondent's second, third, fourth, and eighth requests.

██ The second request is: "The occupant of the farm, Mr. Tubbs, may be justified in taking life in defense of his habitation, but he would not be justified in slaying a licensee without first giving him notice to leave.''

This request was properly refused as it is not applicable to the evidence in the case. There is no evidence tending to show, nor did the respondent claim below, that he killed the deceased in defense of his habitation. *Porter Screen Mfg. Co.* v. *C. V. Ry. Co.*, 92 Vt. 1, 102 Atl. 44.

██ ██ The third request is: "Where a person, being without fault, is assaulted on his own premises at or near his dwelling house, such as in his barn or carriage shed near his house and on the same premises, he need not retreat although he can do so without increasing his danger, but he may lawfully resist or even pursue his adversary until he frees himself from danger even to killing, if necessary.''

This request was properly refused for the reason, among others, that a person, when assaulted, can only take life in self-defense when it reasonably appears to him that he is in danger of death or of serious bodily harm. *State* v. *Patterson, supra.*

 The fourth request, in substance, is the charge of the court on the law of self-defense in *State* v. *Wood,* 53 Vt. 560, and which, this Court said, was beyond question as favorable a presentation of that branch of the case as the respondent was entitled to.

The court below charged fully on the subject of self-defense and in substantial compliance with this request, and no exception was taken to the charge as given.

As a statement of the law of self-defense the request is defective in that it omits the element that, if the party assaulted has other means of avoiding the assault that appear to him at the time as sufficient and available, and which are in fact sufficient and available, he must resort to them and cannot use force in self-defense. *State* v. *Roberts,* 63 Vt. 139, 21 Atl. 424.

 The eighth request asked the court to charge that it was not necessary that the respondent "should reasonably fear for his life, his reasonable fear of great bodily harm would justify his slaying his adversary if it reasonably appeared to the said Tubbs that it was necessary and he was not the aggressor."

The charge of the court was in substantial compliance with this request. The court instructed the jury that: "The respondent had the lawful right to defend himself if he was assaulted and to use such force as reasonably appeared to him at the time and under the circumstances to be necessary to protect himself effectually," and "if it reasonably appeared to him that he was in danger of death or of serious bodily harm, he might lawfully take human life, if it then reasonably appeared to him to be necessary for his own adequate protection."

*Judgment that there is no error in the record, and that the respondent takes nothing by his exceptions. Let execution be done.*