STATE *v.* ROY ROUNDS.

January Term, 1932.

Present: POWERS, C. J., SLACK, MOULTON, THOMPSON, and GRAHAM, JJ.

Opinion filed May 4, 1932.

444

*M. G. Leary* and *Guy M. Page* for the respondent.

446

*Lawrence C. Jones,* Attorney General, for the State.

GRAHAM, J. On June 20, 1930, the respondent and one Allen Thompson engaged in a fist fight at the entrance to the barn on the home premises of the respondent in Jericho. The blows struck by respondent caused severe injuries to Thompson's face, including the fracture of the left jaw and the fracture of several other facial bones. The next day Thompson was taken to the Fanny Allen Hospital in Winooski for treatment, and he remained there until he died on July 16, 1930. Early in the morning of July 15, Thompson was found lying upon the floor of his room in the hospital, and later the same day discovery was first made that three of his ribs on the left side were fractured. One of the fractured ribs punctured the pleural cavity which contained streptococcic pus and caused the bacteria to enter the blood stream. The terminal cause of death was the pus in the pleural cavity admitted to the blood by the broken rib puncturing the cavity. The respondent was convicted of involuntary manslaughter. By motion for a directed verdict, and also by motion to set the verdict aside, he challenges the sufficiency of the evidence to support the verdict on the following grounds: (1) That, since the evidence adduced by the State showed that respondent was first assaulted, there was not in the case sufficient evidence to warrant the jury in finding beyond a reasonable doubt that the acts of the respondent were not done in self-defense; and (2) that the evidence does not justify the finding and conclusion of the jury that the death of Thompson resulted from any act of the respondent, and especially from any unjustified blow by the respondent; but that the evidence showed that his death was produced by an intervening efficient cause due to accident and mischance. Upon the overruling of these motions, the questions were saved for review by proper exceptions.

In the consideration of these motions, the respective functions of the jury and the court must be kept in mind and adhered to. In this respect the rule is the same in criminal as in civil cases. The evidence must be taken in the most favorable light for the State; and, if there is some evidence tending to support or justify the verdict, it is for the jury to construe it, and to determine its weight. *State* v. *Pierce,* 103 Vt. 383, 386, 154 Atl. 675. A motion to set aside the verdict on the ground that it is contrary to the evidence is addressed to the sound dis-

cretion of the trial court, and the action of that court cannot be disturbed except for abuse of discretion; but when all the evidence is before the court, and the exception is taken on the ground that the verdict is wholly unsupported by the evidence, the rule as to discretion does not apply and the action of the trial court is reviewable here. *Wellman, Admr.* v. *Wales,* 97 Vt. 245, 248, 249, 122 Atl. 659, and cases there cited. When the facts are such that reasonable men can fairly draw but one conclusion, or where the evidence is undisputed or of such character that the court in the exercise of a sound judicial discretion would be compelled to set aside a verdict returned in opposition to it, the court should, on motion, withdraw the case from the jury. *Spaulding* v. *Mut. Life Ins. Co.,* 94 Vt. 52, 56, 109 Atl. 22, 29; *Neill* v. *Ward,* 103 Vt. 117, 158, 159, 153 Atl. 219. For obvious reasons, this rule cannot apply against a respondent charged with crime, but it should have full application in his favor. Where the evidence is so defective that a verdict of guilty based upon it cannot be sustained, a verdict of not guilty should be directed. *State* v. *Davis,* 116 Me. 260, 101 Atl. 208; *State* v. *Donahue,* 125 Me. 516, 133 Atl. 433. When the evidence only raises a mere suspicion of the guilt of the accused, or leaves it uncertain or dependent on conjecture, it is insufficient to warrant a conviction, and the court should direct a verdict of acquittal when requested by the respondent. *High* v. *State,* 2 Okla. Crim. Rep. 161, 101 Pac. 115, 28 L. R. A. (N. S.) 162; *Copeland* v. *State,* 23 Ala. App. 91, 121 So. 445. See, also, *People* v. *Bennett,* 49 N. Y. 137; *People* v. *Ledwon,* 153 N. Y. 10, 46 N. E. 1046.

We will consider the grounds of the respondent's motion for a directed verdict in the order stated: First, whether the respondent's acts were in self-defense. The respondent was road commissioner of the town of Jericho, and Thompson was employed by him to work on the town roads. Late in the forenoon of June 20, work for the town was stopped on account of weather conditions, and the respondent hired Thompson to work for him on his barn. After the noon meal, Thompson, who had been drinking and was somewhat under the influence of intoxicating liquor, did not return to his work. The respondent saw him in the house and asked him if he was not going to work that afternoon, and Thompson replied that he would when "he

got damn good and ready." Respondent discharged Thompson and hired another man to take his place. While respondent was on his way to his barn, Thompson came from the house toward him, saying he was going to the barn to work. Respondent told him to go away and not bother the help. As respondent reached the entrance to the barn, Thompson, who was following him, said: "You son of a ——— I will show you that you cannot tell me when to go home." The only direct evidence of what occurred immediately following this remark came from the respondent. He testified that at this threat, he turned just as Thompson was striking towards his head; that he dodged and the blow hit his shoulder; that respondent then struck Thompson in the face, and Thompson struck back three or four times, hitting respondent's hand raised as a guard; that he struck Thompson only three blows, all of them in the face; that the last blow hit Thompson on the mouth, which knocked him down, and he went right up against the corner of the barn door.

Thompson was a drinking man, and was particularly quarrelsome when under the influence of intoxicating liquor. The respondent had previously discharged him for drinking while at his work. For these acts Thompson had made threats of violence against the respondent, and the respondent had heard of these threats. But respondent did not know that Thompson had been drinking the day of the assault.

■ ■ In the circumstances it is clear, and the State admits, that the respondent had the right to use sufficient force to repel the attack made upon him by Thompson. The rule as to the right to use force to repel an assault and battery is that the assailed may beat his assailant so far as to make him desist; but he cannot inflict great bodily harm or take the life of the assailant, unless he reasonably apprehends death or great bodily harm to himself, and then he may not do so if he has other means of avoiding the assault that appear to him at the time as sufficient and available, and which are in fact sufficient and available. *State* v. *Patterson,* 45 Vt. 308, 12 A. R. 200; *State* v. *Roberts* 63 Vt. 139, 21 Atl. 424; *State* v. *Tubbs,* 101 Vt. 5, 23, 139 Atl. 769. Mr. Bishop in his work on Criminal Law, Ninth Edition, vol. 1, § 867, says: "One cannot lawfully kill another who comes merely to beat him, but may repel the assault by beating till the aggressor desists." But, says Mr. Bishop,

(vol. 1, § 865) : "If one who is assaulted (there must be an overt act, rendering the danger imminent), being himself without fault in bringing on the difficulty, reasonably apprehends *death* or *great bodily* harm to himself unless he kills the assailant, the killing is justifiable." The amount of force which one may justifiably use in self-defense is such as reasonably appears to him to be necessary under all the circumstances in the case, and whether he is justified in the particular occasion, depends upon whether the jury find that it reasonably appeared to him that it was necesary to use the force which he did use. *McQuiggan* v. *Ladd,* 79 Vt. 90, 105, 64 Atl. 503, 14 L. R. A. (N. S.) 689. In *Russ* v. *Good,* 90 Vt. 236, 239, 97 Atl. 987, 988, this Court says : "When one is assailed by another, and from the nature and circumstances of the attack, viewed in the light of known threats or hostile conduct made or exhibited by the assailant, and his known character for violence, he has reasonable ground to believe and does believe, that he is in danger of bodily harm, he may be justified in striking his assailant without waiting to be actually struck himself. And this rule is equally applicable whether the question is how much force he is justified in using, or is he justified in using any force, in his defense."

 It is true, as the respondent argues, that, since the evidence adduced by the State showed that respondent was first assaulted, the burden was upon the State to prove beyond a reasonable doubt that the acts of the respondent were not done in self-defense. *State* v. *Patterson, supra.* Therefore, the precise question now before us is whether there is in the case any evidence tending to show that the force used by the respondent was excessive, so as to make it a jury question.

 While the respondent says that he struck only three blows, and that Thompson was pressing the attack to the third blow, yet the State is not bound by his version of the encounter, if there is evidence of facts and circumstances from which opposing inferences may fairly and reasonably be drawn. The State argues that the evidence of the number and character of the injuries received by Thompson from blows struck by respondent is sufficient to warrant a finding by the jury that excessive force was used. These injuries, according to the tendency of the evidence, were a badly swollen face, especially the right eye, two lower teeth broken and removed, a bunch on the forehead, nasal

cavity and mouth partly filled with blood, abrasion on left shoulder and a black and blue mark on left upper arm, and a fracture of the jaw, high up on the jaw near the articulation on the left side. On post-mortem examination several other fractures of the facial bones were found which the evidence showed were attributable to blows by the respondent. The respondent received no injuries in the contest.

The respondent has addressed to us a serious argument that, since the blows were struck with the fists only, excessive force cannot be determined from the effect of such blows, for, he says, a person in actual conflict with a powerful and belligerent attacker (as Thompson unquestionably was) ought not to be bound to measure with nicety the force of his blows. Quite true, but the reasoning applies to the application of the rule and not to the rule itself. The legal measure of justifiable force, as we have stated, is such force as reasonably appears under all the circumstances to the person attacked to be necessary for his protection. This rule is equally applicable to all force regardless of the means employed. The character of the force employed is a circumstance for the jury's consideration, but it does not control the measure of force lawfully used in self-defense. The injuries to Thompson were numerous and serious, and raise a strong inference of great violence. A physician, who treated Thompson the day of the fight, testified that all the injuries which he discovered, including the fracture of the jaw, could have resulted from three blows of the fist; but the respondent stated immediately after the fight that "he guessed he struck him a little too hard," and the same afternoon he further stated that "he hadn't ought to have struck him only once." We think that the evidence was sufficient to make it a jury question, under proper instructions, whether the respondent used excessive force. There was no error in overruling respondent's motion on this ground.

The second question raised by the motion is whether the evidence justifies a finding and conclusion that the death of Thompson resulted from any unlawful act of the respondent. The conviction cannot stand unless there is competent evidence tending to show that some unlawful act of the respondent was the cause of death. *State* v. *Wood and Smith*, 53 Vt. 560. The injuries inflicted by respondent were not fatal in their nature.

The respondent contends that the evidence connects him only with the facial injuries, and that on the evidence there is no causal connection between those injuries and death; that death resulted from an independent intervening accident or mischance. The contention of the State as to the chain of causation is: (1) That the broken ribs were caused by respondent, or (2) that if the broken ribs were caused by falling out of bed, such fall was occasioned by Thompson's delirium which was caused by respondent's blows. Thompson was unconscious after being struck the blows; he did not fully regain consciousness to the time of his death; much of the time he was in a state of coma and delirium, and had to be restrained in bed. At the time of death Thompson was suffering from sinus infection, from chest infection, from broken ribs, from œdema, commonly called "wet brain," and from facial injuries. Death was immediately caused by the chest infection entering the blood.

The respondent's unlawful acts need not be the sole cause of death; it is sufficient if they were a contributory cause. *State* v. *Block,* 87 Conn. 573, 89 Atl. 167, 49 L. R. A. (N. S.) 913. The respondent is responsible for the consequences, even where his acts were not the immediate cause of death, if an intervening cause was the natural result of his wrongful acts. *Letner* v. *State,* 156 Tenn. 68, 299 S. W. 1049, 55 A. L. R. 915. The rule is stated in 2 Bishop, Crim. Law, § 637, that "whenever a blow is inflicted under circumstances to render the person inflicting it criminally responsible if death follows, he will be deemed guilty of the homicide though the person beaten would have died from other causes, or would not have died from this one had not others operated with it; provided the blow contributed either mediately or immediately to the death, in a degree sufficient for the law's notice. In other words, the blow or wound for which the defendant is responsible need not be the sole cause." Again, in section 639, Mr. Bishop says: "It (the wound) need not even be a concurrent cause; much less need it be the next proximate one; for if it is the cause of the cause, no more is required."

For application of the rule we turn to the evidence. We have examined the transcript with the care required by the importance of the question. The record does not justify a conclusion that the respondent caused the fracture of Thompson's.

ribs. There is no evidence of any blow in the vicinity of the ribs; no marks of any injury near the ribs were discovered; the attending physician testified that if the ribs had been broken prior to July 15, they would have been discovered by him in his examinations, and the autopsy disclosed a condition usually found in a break of two or three days. The only evidence which the state claims in any way connects the respondent with the broken ribs is from the testimony of a student nurse employed at the hospital, and who was in charge of Thompson the night of July 15 when he was found on the floor. She testified that from the time Thompson came to the hospital, he made gestures of pain in the chest, and "if we rubbed him, he would favor that chest—he didn't want it touched." The witness never told the attending physician or the nurse in charge about these symptoms, and no record of them appears on the hospital chart. During periods of delirium, Thompson was kept in bed by the use of a restraining sheet, which was tied over his chest, and fastened to either side of the bed. Some of the rods of the bed were bent by his straining against this sheet. This may well account for any indication of chest tenderness here disclosed; at least, it removes from that condition all support for an inference that Thompson's ribs were broken before July 15, especially when considered in connection with the convincing direct evidence to the contrary. It is not the "more probable hypothesis, with reference to the possibility of other hypotheses." *Wellman, Admr.* v. *Wales,* 97 Vt. 245, 253, 122 Atl. 659.

The sinuses and the pleural cavity contained streptococcic pus. The evidence wholly fails to account for its presence in the pleural cavity. The germ is in the air, and infection may be from breathing by otherwise healthy persons. The State pathologist, who performed the autopsy on the body of Thompson, testified that there are several things that cause pus in the pleural cavity, and (quoting from his testimony) "can't say in this case"; "it is only speculation." It was probably present in the pleura before Thompson was found out of bed, but further than that, how or when it probably developed, the evidence does not disclose. These bacteria went from the pleural cavity and caused death. "Back of that," says the State pathologist, "I cannot go"; nor does the testimony of any other medical witness. The sinus infection is likewise unaccounted for. It may

exist for a long period without the patient knowing it. The State pathologist testified that he never heard of this condition being caused by a "blow on the head," and further (quoting) : "I do not attempt to account for it," and no other medical witness attempted to account for its origin. It appeared that there was a considerable discharge from Thompson's mouth of a thick, creamy appearing pus or pus-colored mucus. The attending physician was asked whether this discharge falling back in the throat could create the sinus condition and he answered, "might possibly, I hardly think it would." No other witness expressed an opinion of any connection between the mouth discharge and the sinus or pleural infection.

Thompson had long been addicted to alcoholic liquors, especially during the last months of his life; he had been drinking, and was acting in a strange and unusual manner just before his altercation with respondent, but he had worked during the forenoon of that day and was apparently in health. The autopsy disclosed that Thompson's skull was not fractured, that is, there was no fracture of the bone surrounding the brain; he was suffering from œdema or wet brain, which is more apt to be due to chronic alcoholism than to any other cause, and not likely to result from injury. Oedema produces delirium or unconsciousness, more often a comatose condition than delirium. The only medical evidence to support an inference that Thompson's brain condition was attributable to respondent is the testimony of the physician who was called to treat Thompson the day of the fight. His testimony to this point on cross-examination was as follows: Q. "You detected signs of intoxication?" A. "I did." Q. "But you didn't deem it necessary to give any treatment for concussion or anything of that sort under the circumstances?" A. "No." Q. "You were satisfied that the unconsciousness and delirium were due to intoxication?" A. "Not wholly." Q. "Did you see anything that required treatment for anything that would produce unconsciousness?" A. "There was something that made him unconscious, the alcohol, of course, I thought had something to do with it."

We would have little difficulty in sustaining a finding that some blow struck by respondent was a contributing factor in producing Thompson's brain condition, but since respondent was justified in using some force in self-defense it

cannot be said that the evidence justifies the inference that Thompson's unconsciousness and delirium were caused by any *unlawful* blow struck by respondent. If any unlawful force used by respondent contributed to cause the delirium, a proximate causal connection between such force and the death might be established (see *McKane* v. *Capital Hill Quarry Co.,* 100 Vt. 45, 47, 134 Atl. 640), but, if the respondent's blows were partly justified and partly not justified, then he cannot be held responsible for homicide unless the unlawful blows contributed to the death. *Weston* v. *State,* 167 Ind. 324, 78 N. E. 1014; *Rogers* v. *State,* 60 Ark. 76, 29 S. W. 894, 31 L. R. A. 465, 46 A. S. R. 154. In the latter case, where the evidence warranted the assumption that the first shot was in self-defense and the second could not be so justified, the court said: ''On the other hand, if the first shot was fired in self-defense, and the last shot neither caused his death nor contributed to or hastened it, then he could not properly be convicted of any degree of homicide, but might be convicted of an assault.''

The State relies upon *State* v. *Block,* 87 Conn. 573, 89 Atl. 167, 49 L. R. A. (N. S.) 913, but the facts of that case were unlike those of the present case. In that case, the decedent died of delirium tremens; there was evidence that they were caused by injuries for which the defendant was responsible, and that otherwise they would not have occurred and caused the death. In the present case, the immediate cause of death is established by competent evidence, but the cause of the cause of death was left to the judgment of the jury without the guidance of expert medical testimony. There are many cases where the facts proved are such that any layman of average intelligence would know, from his own knowledge and experience, that the injuries were the cause of death. In such a case the requirements of the law are met without expert testimony. *Waller* v. *People,* 209 Ill. 284, 70 N. E. 681. But where, as here, the physical and mental processes terminating in death are obscure and abstruse, and concerning which a layman can have no ''well grounded opinion,'' there is no proper foundation for a finding by the jury without expert medical testimony. We have many times applied this rule in civil cases. In *LeClair* v. *Montpelier & Wells River R. R.,* 93 Vt. 92, 97, 106 Atl. 587, 590, we said: ''However, the causal connection (between a present physical

condition and a previous accident) might in some cases be so obscure as to require such (expert) testimony to remove the inference from the realm of speculation.'' It is a governing principle in malpractice cases. *Sheldon* v. *Wright*, 80 Vt. 298, 67 Atl. 807; *Lawson* v. *Crane*, 83 Vt. 115, 74 Atl. 641; *Parker* v. *Bowen*, 98 Vt. 115, 119, 120, 126 Atl. 522. It is applicable to a claim for future damages. *Ryder* v. *Vermont Last Block Co.*, 91 Vt. 158, 99 Atl. 733.

██ ██ In a homicide case, where the life or liberty of a citizen is at stake, and where the guilt of the accused must be established beyond a reasonable doubt, the causal connection between the death of the decedent and the unlawful acts of the respondent cannot be supported on mere conjecture and speculation. In *Wellman* v. *Wales*, 98 Vt. 437, 440, 129 Atl. 317, 319, we said that, ''Evidence which merely makes it possible for the fact in issue to be as alleged, or which raises a mere conjecture, surmise, or suspicion, is an insufficient foundation for a verdict.'' There being no competent evidence tending to establish an essential element of the crime charged, the respondent's motion for a directed verdict should have been granted.

Other exceptions by respondent either raise the same questions already disposed of, or, in view of our disposition of the case, they become unimportant.

*Judgment reversed, conviction and sentence set aside, and cause remanded.*